Filed 11/30/17; Certified for Publication 12/28/17 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re A.L. et al., Persons Coming Under the Juvenile Court Law. | B281449 (Los Angeles County Super. Ct. No. DK19980) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. M.V., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Lisa R. Jaskol, Judge. Reversed.

Liana Serobian, under appointment by the Court of Appeal, for Defendant and Appellant M.V.

Mary C. Wickham, County Counsel, R. Keith Davis, Assistant County Counsel, and William D. Thetford, Principal Deputy County Counsel, for Plaintiff and Respondent.

In this juvenile dependency appeal, M.V. (Mother) challenges juvenile court jurisdictional findings made under Welfare and Institutions Code section 300, subdivision (b)(1),[1] pertaining to her then 15-year-old son (A.L.) (born December 2000) and 11-year-old daughter (J.L.) (born December 2004). Mother contends the evidence is insufficient to establish that the children have suffered, or that there is a substantial risk they will suffer, serious physical harm or illness by reason of her inability to provide regular care due to her mental illness or the failure of the children's father (the father)[2] to protect them from Mother's mental illness. We agree and reverse. And because the petition must be dismissed in its entirety, we need not reach Mother's contention that the juvenile court erred in refusing to order informal supervision pursuant to section 360, subdivision (b), or to terminate dependency jurisdiction and issue family law exit orders.[3]

---

[1] Unless otherwise specified, statutory references are to the Welfare and Institutions Code.

[2] The father is not a party to this appeal.

[3] Section 360, subdivision (b), provides that, if the juvenile court finds the child to be a person described by section 300, "it may, without adjudicating the child a dependent child of the court, order that services be provided to keep the family together and place [the family] under the supervision of the social worker" for a specified period.

At the Department of Children and Family Services' (DCFS) request, we have taken judicial notice of a juvenile court minute order of June 20, 2017, whereby the court terminated dependency jurisdiction and issued family law exit orders granting the father sole physical custody and Mother monitored visits. In light of that order, the issue is moot in any event.

## FACTS AND PROCEDURAL HISTORY

On October 2, 2016, DCFS received a referral alleging that Mother had physically abused her daughter J.L. One day earlier, after awaking from a nap, Mother went to the refrigerator, took out a carton of milk, and started yelling that the milk was poisoned and people were trying to poison her. When J.L., A.L., and the father tried to explain to Mother that no one was trying to poison her, Mother became very upset, accusing them of also trying to poison her. Mother started throwing objects, including a shoe that hit J.L. on her arm or head. At that point, A.L. physically restrained Mother while the father called law enforcement for assistance. The father explained to the investigating officer that Mother had previously been diagnosed with schizophrenia, was having a manic episode, and needed help. Mother was thereafter placed on an involuntary hold under section 5150 and taken to Charter Oak Psychiatric Hospital, where she remained until October 14.

The father and Mother never married, but had been living together since they were teenagers. In 2012, they apparently ended their romantic relationship, although they continued to live together.

In 2013, Mother started to display mental issues; she began to talk to herself, refused to leave the home, and became paranoid. The following year, she went to live with her mother in Arizona. While there, Mother spent six months in a mental institution, where she was treated, released, and provided with prescribed medication. After she returned home in March 2015, Mother stayed in her bedroom much of the time, refusing to take her medication and hiding it from the father because she feared he was going to poison her. At one point, the family was forced to vacate their apartment due to Mother's loud screaming, after which they moved

in with the paternal grandmother.  In addition to her mental issues, Mother is hearing impaired and is afraid of being alone.

When interviewed by the social worker, both A.L. and J.L. indicated they have plenty of food, feel safe at home, go to school regularly, do their homework when they come home, and wear clean clothes.  A.L. said his parents do not hit him and there are no drugs or alcohol in the home.  When his parents argue, Mother starts to throw things and the father yells, and A.L. gets in between them to prevent Mother from "getting in father's face."  Mother's condition makes A.L. sad.  The recent incident with Mother was not typical. When Mother started throwing things, A.L. restrained Mother because he did not want her to hurt herself or anyone else.  He reportedly said, "My mom is crazy but she would never do anything to hurt me."  A.L. had researched Mother's illness and "found his own way of working with [her] when she gets into her manic state." When that happens, A.L. does not try to provoke her because he knows she will "quiet down soon."  At school, A.L. has weekly discussions with his peers on various topics of concern to teenagers, including bullying, suicide, depression, as well as paranoid schizophrenia.

J.L.'s description of living at home with her parents was much the same as A.L.'s.  Neither of them was afraid of anyone, and when they disobeyed their parents, the parents took away their phones and they were not allowed to use the computer except for homework.  When Mother throws things, she does not aim at anyone; during the recent incident, J.L. "got in the way" and the shoe Mother threw "touched" her on her upper left arm.  J.L. would like Mother to live with her, but would like Mother to get help; she wants Mother to recover.

According to the father, this was the first time Mother had become physical with family members. Although there were prior incidents where Mother threw objects, she never threw anything *at* any of them. Furthermore, the children are never alone with Mother; either the father or the paternal grandmother is always at home.

When interviewed by the social worker while at Charter Oak, Mother denied throwing anything on the day of the incident and said that the father and the paternal grandmother are trying to turn the children against her. As she talked about the milk being poisoned, Mother became agitated and started yelling at the social worker that she believed the social worker and the father were trying to kill her.

On October 13, 2016, the social worker learned that Mother was to be released from Charter Oak the following day, but the hospital could not find a placement for her because she had no income. The father told the social worker that he planned to pick Mother up because she had nowhere to go and "he is not going to put her out on the streets." The next day, the father and the children picked up Mother.

As a result, on October 17, 2016, DCFS removed the children from the family home. On October 20, DCFS filed its dependency petition. As sustained,[4] the petition alleged that Mother "has mental and emotional problems[,] including delusional behavior, which render [her] unable to provide regular care of the children. On prior occasions in 2016, [she] was hospitalized for the evaluation and treatment of [her] psychiatric condition. On prior occasions,

_____

[4] Two additional counts under section 300, subdivisions (a) and (b)(1) alleged domestic violence between the parents and the father's criminal history, including a conviction for domestic battery. These counts were later dismissed.

[she] failed to take [her] psychotropic medication as prescribed. [The father] knew of [Mother's] mental and emotional problems and [he] failed to protect the children. The father allowed [Mother] to reside in the children's home and have unlimited access to the children. Such mental and emotional condition on the part of [Mother] and the father's failure to protect the children endanger the children's physical health and safety, create a detrimental home environment and place the children at risk of serious physical harm, damage, danger and failure to protect."

A detention hearing was held the same day. The juvenile court declared the father the children's presumed father, released them to his care and custody, and ordered Mother to vacate the family home, but provided her with monitored in-person visits and unmonitored telephone contact with the children.[5] The juvenile court found that the Indian Child Welfare Act did not apply.

The jurisdiction hearing proceeded as scheduled on December 20, 2016. Mother, who had been residing in Arizona with the maternal grandmother since the day of the detention hearing, was in attendance. According to the maternal grandmother, Mother was current on her medication and would soon be receiving services in Arizona.

The juvenile court sustained the b-1 count in its entirety, dismissed the remaining counts, and declared the children dependents. As for disposition, the juvenile court ordered DCFS to provide family maintenance services to the father, enhancement

_____

[5] At the request of the father's counsel, the juvenile court directed DCFS to assess the appropriateness of a contract under section 301, which provides for the social worker to implement a program of supervision in lieu of filing a petition or subsequent to the dismissal of a petition already filed. The social worker stated that she was unable to speak to Mother to assess her progress, and therefore did not proceed to evaluate such possibility.

services to Mother, and individual counseling for the children.  The juvenile court also ordered Mother to participate in individual counseling and mental health evaluation and treatment, and directed DCFS to make its best efforts to facilitate Mother's participation in services in Arizona, where Mother was then living with the maternal grandmother.  Lastly, the juvenile court set a review hearing for June 20, 2017, to address the appropriateness of closing the case.[6]

Mother timely filed a notice of appeal.

## DISCUSSION

The focus of this appeal is the juvenile court's order sustaining allegations under section 300, subdivision (b)(1), that Mother's mental illness and the father's failure to protect the children from Mother's mental illness endanger the children's physical health and safety and place them at substantial risk of serious physical harm.  As relevant here, that subdivision authorizes dependency jurisdiction when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child, . . . or by the inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness."

We review the juvenile court's findings for substantial evidence.  (*In re A.G.* (2013) 220 Cal.App.4th 675, 682-683.)  In so doing, we view the evidence in the light most favorable to the juvenile court's order, bearing in mind that, while substantial evidence may consist of inferences, inferences which are the result of speculation cannot support a finding.  (*Ibid*.)

---

[6] On that date, the juvenile court terminated dependency jurisdiction and issued family law exit orders.  (See fn. 3, *ante*.)

7

At the outset, it is clear from the record that A.L. and J.L. suffered no actual harm as a consequence of Mother's mental illness. Although this matter came to DCFS's attention as a referral for physical abuse following the October 1 incident, the record is devoid of any evidence of abuse. True, during her manic episode Mother threw a shoe which happened to hit J.L. on her head or her arm, but J.L. was not injured and it had never happened before. Nor was A.L. ever harmed when he would intervene during his parents' arguments by sitting between them in an effort to curb Mother's anger. Although there is no question that Mother has mental health issues, the law is settled that harm may not be presumed from the mere fact of a parent's mental illness. (*In re David M.* (2005) 134 Cal.App.4th 822, 830; *In re James R.* (2009) 176 Cal.App.4th 129, 136; *In re Matthew S.* (1996) 41 Cal.App.4th 1311, 1318.)

Indeed, the juvenile court was well aware of this principle. Before deciding the case, it acknowledged that Mother clearly had serious mental health issues, but questioned whether her mental illness had caused or would cause serious harm to the children. Counsel for DCFS, joined by minors' counsel, responded that A.L.'s actions in intervening in his parents' altercations, and thereby subjecting himself to a risk of substantial harm, show that the father failed to protect the children by allowing A.L. to take on this role.[7] The juvenile court found counsel's arguments persuasive, explaining that it was "entitled to look at past events in considering

---

[7] DCFS makes much of the father's remark to the DCFS social worker that A.L. "had his mother in a chokehold." In describing that incident, however, A.L. said he grabbed Mother and "gave her a bear hug," an action which the father apparently mischaracterized as a "chokehold." Moreover, A.L. took that action as a protective measure and it was the only time he had to "hold [Mother] back down."

8

what might happen in the future." The juvenile court stated that the father had made "great efforts," that what he had done was "commendable," and that he had "gone above and beyond." Nonetheless, the juvenile court concluded that the father had not done enough to protect the children. Although we agree that the juvenile court was entitled to evaluate past events as they may be predictive of future dangers, the facts before us do not support the juvenile court's conclusion that the children were at substantial risk of serious physical harm due to the father's failure to protect the children from Mother's mental illness, as required by section 300, subdivision (b)(1).

Hanging its hat on the juvenile court's implicit finding that the father had not done enough to protect the children from Mother's mental illness, DCFS maintains there is no reason to believe that the father will be able to protect the children in the future should Mother return to the family home. DCFS contends that Mother's removal from the family home did not eliminate the risk and insists that, in the event Mother returns home and the family is faced with an incident such as the one which occurred on October 1, history will repeat itself and the father will again be unable to protect the children. We cannot agree.

Substantial evidence does not support the juvenile court's finding that the father failed to protect the children from Mother's dangerous conduct or that Mother's condition created a substantial risk of physical harm to the children in the future. Although Mother had been diagnosed with schizophrenia for some time, this was the first time the family sought assistance from law enforcement. The incident occurred after Mother stopped taking her medication. No one was injured and the father acted quickly to obtain appropriate help, after which Mother was placed in a psychiatric facility until her condition could be stabilized. Once she left the facility, Mother resumed taking her medication.

9

Moreover, the evidence showed that A.L. and J.L. were well cared for in spite of the reality that Mother suffered from mental illness. They loved Mother and wanted her back in the home. Indeed, the family worked together to manage the situation and their efforts were successful. These children were not youngsters. A.L., who was almost 16 years old, was well aware of Mother's mental illness, had done research on the subject, and had discussed related issues in school. He knew what to do when Mother was in a manic state. During the October 1 incident, A.L.'s maturity and experience allowed him to help deescalate the situation.

In summary, the juvenile court's intervention was not needed because no one was injured and the family immediately took steps to resolve the problem. Nor is there any reason to believe that the father and the family will be unable to safely handle any future problems. Thus, the juvenile court erred in asserting jurisdiction over these children.

## DISPOSITION

The jurisdictional order made on December 20, 2016, is reversed, and the disposition order and all subsequent orders are vacated as moot.

ROTHSCHILD, P. J.

We concur:

CHANEY, J.

JOHNSON, J.

10

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re A.L. et al., Persons Coming Under the Juvenile Court Law. | B281449 (Los Angeles County Super. Ct. No. DK19980) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> M.V., <br><br> Defendant and Appellant. | CERTIFICATION AND ORDER FOR PUBLICATION |

THE COURT:

      The opinion in the above-entitled matter filed on November 30, 2017, was not certified for publication in the Official Reports.  For good cause, it now appears that the opinion should be published in the Official Reports and it is so ordered.

_____

ROTHSCHILD, P. J.      CHANEY, J.      JOHNSON, J.