Filed 3/13/23  In re Y.M. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re Y.M., a Person Coming Under the Juvenile Court Law. | B316580 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No 21CCJP03042) |
| Plaintiff and Respondent, | |
| v. | |
| V.M., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Hernán D. Vera, Judge.  Affirmed.

Roni Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Interim County Counsel, Kim Nemoy, Assistant County Counsel, and Veronica Randazzo, Deputy County Counsel, for Plaintiff and Respondent.

————————————

V.M. (mother) appeals from jurisdictional and dispositional orders regarding her daughter (Y.M.) under Welfare and Institutions Code section 300.[1]  Mother contends there was insufficient evidence to support the juvenile court's finding that her mental health issues placed Y.M. at a substantial risk of harm.  We reject her contention and affirm the orders.

## BACKGROUND

The family consists of mother, father, and Y.M. (born November 2010).  Mother and father separated after an eight-year relationship.  At the time the Los Angeles County Department of Children and Family Services (DCFS) began investigating the family's circumstances, mother and Y.M. resided with mother's boyfriend in Downey, California, while father lived in Oregon.  Y.M. visited father once or twice per year.

## I.     The events giving rise to the current petition

In June 2021, DCFS received a referral that mother suffered from personality and major depressive disorder, was delusional and a danger to herself, was threatening to kill herself by claiming that she had a gun in the presence of police officers

---

[1] All subsequent statutory references are to the Welfare and Institutions Code unless otherwise specified.

in an effort to get them to shoot her, and had been placed on an involuntary hospital hold under section 5150.  DCFS was asked to respond to the local police department to take custody of Y.M., because there was no one to care for her once mother was placed on the involuntary hold.

Emergency response children's social worker Jennie Cortez reported to the police department and spoke with Gary Vazquez, a psychiatric social worker from the Los Angeles County Department of Mental Health (DMH).  According to Vasquez, he and law enforcement responded to mother's home after receiving a request for a welfare check based on mother's suicidal ideations.  The request came from mother's therapist, Ebony Reado.

When Vasquez and law enforcement arrived at mother's home, mother was cooperative and admitted that her plan was to lie and say she had a gun so that law enforcement would kill her.  Mother shared with Vasquez her post-traumatic stress disorder (PTSD) and borderline personality diagnoses, although mother's mental health records from DMH reflected a diagnosis of anxiety.  Mother reported receiving subliminal messages from a former therapist on social media, leading Vazquez to believe she was suffering from delusions.  Mother stated that these messages overwhelmed her and that she should just kill herself.  Mother had been participating in therapy but was not taking her prescribed psychotropic medication.

While at the police station, Cortez interviewed Y.M., who recalled that mother was on the telephone with her therapist before the police arrived and that mother was "crying a little."  Y.M. recalled mother telling her therapist that people were texting her weird things.  Y.M. did not know the substance of the

3

text messages, but was aware that mother changed her telephone number multiple times because of the number of messages she was receiving.

Y.M. knew mother had a mental illness, but not her diagnosis. Occasionally, mother was sad and cried. Y.M. denied mother said she wanted to harm herself, but the prior evening mother mentioned not feeling important and that no one cared about her. Mother did not take her psychotropic medication because " 'she doesn't trust medicine.' " Mother told Y.M. that mother's former therapist, as well as a neighbor who lived in their apartment complex, had stalked her on social media and done "creepy" things.

When asked by Cortez about her support system, Y.M. reported the majority of her family (including her father) lived in Oregon and mother had no friends. Y.M. indicated that mother had told her that family members had also "stalked" mother in the past, and Y.M. wished mother had more support. Y.M. denied being physically or sexually abused. She also denied any drug or alcohol abuse in the home and indicated that she is never left unsupervised.

Cortez also interviewed mother's boyfriend by telephone. He was a truck driver and would not be returning home until the next night. He reported that mother had told him she had been diagnosed with PTSD. Mother had been participating in therapy, but was recently "emotional and distressed" over a lack of support. Mother was also being harassed by a former therapist, as evidenced by strange calls from random telephone numbers and messages sent through fake social media accounts.

Y.M. was temporarily placed in protective custody pending an initial detention hearing before the juvenile court.

4

The next day, mother was discharged and Cortez met her at the family home. Mother reported she had been detained from her own parents at age two. She experienced several traumatic events, including sexual assaults, while in foster care and as an adult. Mother and father married when mother was 18 and they separated after an eight-year relationship. Mother and Y.M. moved in with mother's boyfriend in 2017. Mother claimed her boyfriend's family spied on her on social media, and that her friends, who lived in the same apartment complex, threatened her on social media. Accordingly to mother, a coworker was also stalking her on social media.

Mother stated that she entered therapy in 2018, and was diagnosed with PTSD and borderline personality disorder in January 2021. She acknowledged not taking her prescribed medication. Mother saw several therapists over the next year. She had a poor experience with her first therapist, who criticized her for how she dressed. According to mother, the therapist mother saw from 2019 to 2020 made inappropriate comments toward her and sent her messages via social media using other accounts. Mother believed that therapist misdiagnosed her as only having anxiety. Mother stated that she posted a viral video online and began to receive negative messages about her appearance, with some messages referencing matters she had discussed in therapy.

Mother acknowledged the incident leading to the referral, explaining she had felt overwhelmed and traumatized over the text messages she had received from her former therapist. Because no one had offered to help her or listen to her, she contacted Reado. She acknowledged saying to Reado: " '[W]hat do I have to do? Do I need to call the cops and say I have a gun to

get killed?' " Mother told Reado that "she didn't want to be here," but would not commit suicide because of her daughter.

Mother confirmed that Y.M. was homeschooled at a "Virtual Prep Academy." When DCFS assessed the family's home, it was in good working order and suited to Y.M.'s needs. The family had no history of referrals.

Reado reported that mother had participated in weekly therapy since April 2021. Mother's diagnosis was borderline personality disorder, trauma, and stressor related disorder. Mother did not take psychotropic medication. Mother had reported to Reado that a former therapist had harassed her on social media. Regarding the incident leading to the referral, Reado recalled that, during the call, mother expressed distress and anxiety and presented with paranoia and suicidal ideation. Mother told Reado that she wanted to contact law enforcement and tell them that that she had a gun in an effort to get the police to kill her. Reado also indicated that mother had stated that she intended to provoke someone else to harm her as well. Reado did not have prior concerns of suicidal ideation as to mother. Nonetheless, Reado believed mother could benefit from a higher level of care due to her mental health needs.

DCFS recommended Y.M.'s continued detention to ensure Y.M.'s constant care and supervision, which had been inhibited by mother's mental health issues.

## II. Petition and detention hearing

In July 2021, DCFS filed a section 300 petition on Y.M.'s behalf. The factual allegations, eventually sustained by the juvenile court, were as follows: "[The mother] has a history of mental and emotional problems including diagnoses of Major Depressive Disorder, Post-Traumatic Stress Disorder, Borderline

6

Personality Disorder, Adjustment Disorder, Anxiety, and a history of delusional thinking and paranoia, which renders the mother incapable for [*sic*] providing regular care for the child. On 06/29/21 the mother was involuntarily hospitalized for the evaluation and treatment of mother's psychiatric condition. Such mental and emotional condition[s] on the part of the mother endangers the child's physical health and safety and places the child at risk of serious physical harm and damage."

At the detention hearing, which took place in July 2021, mother appeared over the telephone and was represented by court-appointed counsel. After hearing argument from DCFS and Y.M.'s counsel, both of whom argued in support of detention, and argument from mother's counsel, who opposed detention, the juvenile court detained Y.M. from mother and ordered monitored visits. Y.M. was placed in foster care.

## III.    Multidisciplinary assessment

An August 2021 multidisciplinary assessment report reflected that Y.M. was kind, friendly, engaging, smart, and academically motivated. However, Y.M. was sad about being separated from her mother, among other things, but was "not ready" to discuss that with the assessor or her therapist. Nonetheless, Y.M. reported she was comfortable talking to mother openly about anything.

Y.M.'s foster mother reported that Y.M. had "fits of anger" while learning to socialize with her foster siblings and "some difficulty knowing how to converse with [them]." Y.M. brought up age inappropriate subjects, which the foster mother attributed to her interacting mostly with mother prior to detention.

## IV. Jurisdiction and disposition

### A. *The jurisdiction and disposition report*

The combined adjudication and disposition hearing was scheduled for October 5, 2021. Prior to it, DCFS submitted a report with updated interviews.

Y.M. reported that she was attending the sixth grade, and that this was her first year attending school in person, having been previously homeschooled. When asked why she was in foster care, Y.M. explained that mother had been in foster care most of her life and had gone through a lot of trauma. Mother had " 'a lot of mental issues,' " which Y.M. knew because mother told her, and Y.M. heard mother talking about her issues with others. Y.M. elaborated: " 'I just know she has bipolar, anger issues, and I think ADHD. I am not sure about the ADHD though.' " Y.M. further stated that she was in foster care because " 'they are scared she's going to hurt me because she has mental issues.' "

Y.M. recounted that she could " 'tell when something is wrong' " with mother. Mother pulls her hair and keeps to herself, except when she talks to Y.M. " 'Most of the time she looks spaced out.' " Y.M. elaborated, explaining that she looked " 'sleepy, traumatized, or sad.' " Y.M. denied seeing mother talk to herself or do anything "crazy."

Y.M. confirmed that mother " 'every once in a while' " told Y.M. she wanted to hurt herself or end her life. However, mother did not seem serious about it because mother wanted to be with Y.M. Mother did not trust medication because a maternal uncle had schizophrenia and " 'acted crazier' " after taking medication.

As to the referral incident, Y.M. recalled that, as she was on the phone with father, mother entered the apartment crying.

8

Y.M. ended the phone call with her dad and could hear that mother was on the phone with a woman on speakerphone. Y.M. heard the woman tell mother that she was going to call the police. The police arrived about 10 minutes later and asked to enter the home, to which mother agreed. After the officers spoke to mother, they instructed Y.M. to get some belongings and took her to a patrol car. Y.M. then saw mother in handcuffs. Y.M. was told mother was not in trouble and was going to the hospital. Y.M. denied that she heard mother say she wanted to hurt herself or end her life on the day of the incident.

Mother described that she grew up in foster care in Oregon and did not have a relationship with her biological family. She had one sister and three brothers, and had a good relationship with her sister. Mother only saw her brothers when she visited Oregon, where they continued to reside. Mother graduated high school and attended two years of college, obtaining a certificate in life coaching. She was pursuing a degree in social sciences when she had Y.M. (her only child) and had to drop out, but she wished to return to finish her program. Although mother initially moved to Northern California in 2015 to be closer to her biological family, her family there "did not want to get to know her" and she moved to Los Angeles to get a fresh start as a life coach. Mother worked as a life coach until 2020, when she began working as a food deliverer.

Mother acknowledged being diagnosed with anxiety in 2018 or 2019 and then borderline personality disorder earlier in 2021. She claimed that, after the latter diagnosis, she "was not recommend[ed] to take medication as [doctors] did not feel it was necessary for her." She denied being diagnosed with PTSD or adjustment disorder and denied a history of suicidal ideation,

9

delusions, or prior psychiatric hospitalization.  According to mother, her mental health issues had never gotten in the way of her caring for Y.M.  Regarding the referral incident, mother explained she called her therapist because she was having a bad day and was venting:  " 'She (therapist) is African American and I was trying to tell her how in the African American culture mental health is not really taken serious and we don't shed light on the mental health.  I told her that my life should matter before something negative happens to me.  I said, "Do I have to act like something bad is happening to me before the cops get involved for there to be importance or some light to be shed [on] mental health."  She took this out of context.  I wasn't saying I was suicidal.' "

Addressing Y.M.'s health, mother reported that Y.M. had no physical or mental health problems.  Y.M.'s last physical examination was either in 2017 or 2018 in Torrance, though mother did not recall the name of the doctor or clinic.  Y.M.'s last dental examination was in 2018 or 2019.  Y.M. had not received immunizations since the age of four or five because of mother's personal beliefs.  Mother declined to elaborate as to those beliefs because it made her feel as if she was being judged.  Subsequently obtained immunization records reflected that Y.M.'s last immunizations were in 2014.

Maternal aunt, who worked as a case manager for child welfare authorities in Oregon, was also interviewed, reporting that she had limited knowledge of the referral incident because mother was " 'very secretive.' "  Maternal aunt explained that Y.M. was detained because mother had suicidal ideation.  Maternal aunt believed that mother always had mental health challenges.  Maternal aunt elaborated that mother had exhibited

symptoms of anxiety, depression, mood swings, unrealistic expectations (believing the world was against her), and was withdrawn. Maternal aunt visited mother and Y.M. a few times per year, but did not observe anything warranting Y.M.'s removal from the home. However, maternal aunt was concerned that Y.M. was "very sheltered" because she did not attend school or socialize with other children, and mother and Y.M. lived an "isolated" life. Maternal aunt noted that Y.M. was close with her father, having "constant phone contact."

Because mother had unresolved mental health issues and had not been consistently receiving services with one agency due to mother's reported issues with confidentiality, DCFS recommended that the juvenile court sustain the section 300 petition, declare Y.M. a dependent, remove her from mother, and order DCFS to provide mother with reunification services.

*B.  Addendum*

In an addendum report, DCFS reported that father was interviewed and disclaimed knowledge of mother's mental health problems, as well as the circumstances leading to Y.M.'s detention. Although mother had previously shared with father that she had mental health problems as a child, mother neither presented with mental health issues nor did she ever tell father that she suffered from mental health issues. Father was surprised that Y.M. was detained, stating that Y.M. "was okay with her mother."

As to his relationship with Y.M., father reported he and Y.M. had constant phone communication and regularly played online games together. Father would see Y.M. in person when he travelled to California and when Y.M. travelled to Oregon. Father was unable to recount how often they saw each other in

11

person, but did confirm that they always saw each for their birthdays.

DCFS further reported that as of early August 2021, mother was engaged in weekly individual therapy. Mother's new therapist reported that mother "is conscientious in keeping appointments and appears actively engaged in the therapeutic process."

Finally, DCFS assessed father's home in Oregon and, finding no safety concerns, recommended that the juvenile court release Y.M. to father and terminate jurisdiction over the matter with a juvenile custody order providing sole physical custody to father and joint legal custody to mother and father.

C.    *The jurisdiction/disposition hearing*

At the October 2021 jurisdictional and dispositional hearing, the court admitted several of DCFS's reports into evidence and then heard argument from counsel. Counsel for Y.M. argued that the statements of Vasquez (the psychiatric social worker who accompanied law enforcement on the welfare check) and Reado (mother's therapist at the time of the referral) were "most probative" and sufficed to sustain the petition. Mother's counsel requested dismissal of the petition, countering that mother's mental illness was alone insufficient for jurisdiction, and that mother's statements constituted, at most, "venting" to her therapist. Counsel cited several cases in support of the proposition that mental health needs alone are not enough to justify dependency jurisdiction. The juvenile court pointed out that mother's cases were distinguishable because she had conveyed suicidal thoughts to several individuals, including Y.M. Counsel for DCFS joined Y.M.'s counsel's arguments, adding that the evidence reflected that mother had longstanding unresolved

12

mental health issues, and that Y.M.'s therapist stated that Y.M. was traumatized by the situation.

The court sustained the section 300 petition as pled. After hearing the parties' arguments regarding disposition, the court declared Y.M. a dependent, removed her from mother's custody, and granted father sole physical custody, with mother and father to have joint legal custody. The court found that that the conditions justifying the initial assumption of jurisdiction under section 300 no longer existed and later, after a brief period where the court stayed its order pending receipt of a juvenile custody order, terminated jurisdiction.

Mother timely appealed.

## DISCUSSION

### I.     Standard of review

We review challenges to the sufficiency of the evidence underlying jurisdictional findings and dispositional orders for substantial evidence. (*In re I.J.* (2013) 56 Cal.4th 766, 773 (*I.J.*).) " 'Substantial evidence is evidence that is "reasonable, credible, and of solid value"; such that a reasonable trier of fact could make such findings.' " (*In re L.W.* (2019) 32 Cal.App.5th 840, 848.) " ' "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." ' " (*I.J.*, at p. 773.) " ' " ' "The ultimate test is whether it is reasonable for

13

a trier of fact to make the ruling in question in light of the whole record." ' " ' " (*In re John M.* (2012) 212 Cal.App.4th 1117, 1124.)

## II. Substantial evidence supports the jurisdictional and dispositional orders based on mother's mental health issues

Section 300, subdivision (b)(1) provides, in relevant part, that a child comes within the jurisdiction of the juvenile court if the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . [t]he failure or inability of the child's parent or guardian to adequately supervise or protect the child, . . . [or by] the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness." A finding of jurisdiction under section 300, subdivision (b)(1) requires the child welfare agency to prove three elements by a preponderance of the evidence: " '(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) "serious physical harm or illness" to the minor, or a "substantial risk" of such harm or illness.' " (*In re Joaquin C.* (2017) 15 Cal.App.5th 537, 561 (*Joaquin C.*).) The juvenile court "may consider past events in deciding whether a child currently needs the court's protection. [Citation.] A parent's ' "[p]ast conduct may be probative of current conditions" if there is reason to believe that the conduct will continue.' " (*In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1383–1384.)

Harm may not be presumed from the mere fact of a parent's mental illness. (*In re A.L.* (2017) 18 Cal.App.5th 1044, 1050 (*A.L.*).) However, it is not necessary for DCFS or the juvenile court to predict what harm will come to a child because a parent fails to consistently treat his or her illness. It is sufficient

14

to support dependency jurisdiction that a parent's mental illness creates a substantial risk of some harm. (*In re Travis C.* (2017) 13 Cal.App.5th 1219, 1226–1227 (*Travis C.*).) The court "need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child." (*In re R.V.* (2012) 208 Cal.App.4th 837, 843.)

Here, as we set forth below, statements by family members, care providers, and mother's own admissions provide substantial evidence that mother's serious, uncontrolled mental health issues placed Y.M. at substantial risk of serious harm.

On the date of the referral incident, mother had been engaged in mental health treatment for several years for her anxiety and had recently been formally diagnosed with borderline personality disorder. Several other diagnoses, including PTSD and major depressive disorder, are referenced in the record as well, including accounts by mental health clinicians, Y.M., mother's boyfriend, and mother herself (as relayed through DCFS social workers) of episodes of delusions and/or paranoia.

Y.M. was frequently exposed to mother's mental health symptoms, reporting that she observed changes in mother's conduct and level of engagement when her illness flared. Mother discussed her delusions—including that neighbors were stalking her on social media—with Y.M. in intimate detail, and occasionally told Y.M. that she was suicidal or wanted to harm herself. Y.M. said that mother was " 'spaced out' " most of the time, which she described as looking " 'sleepy, traumatized, or sad.' " Y.M. recounted with detail that she could " 'tell when something is wrong' " with mother. Mother would pull her own hair and keep to herself, except when she talked to Y.M. And, during the referral incident, Y.M. observed mother crying while

15

mother's therapist (on speakerphone) told mother that she had to call the police on her, and then mother was taken away in handcuffs several minutes later.[2]

Notably, mother appeared to be in denial about the severity of her illness and had not adequately attempted to control it. Mother not only declined to take prescribed medication,[3] but minimized the extent of her mental health issues, insisting that her statements during the referral incident were taken out of context and that she was not suicidal (despite Y.M.'s statement that mother had expressed a desire to self-harm and/or commit suicide on prior occasions. Mother also denied suffering delusions, yet continued to insist that the underlying circumstances leading to that diagnosis, including a belief that she was being stalked through anonymous phone calls and fake social media accounts by her friends, neighbors, boyfriend's family members, and a former therapist, were true. While mother's engagement in therapy both before and after the referral incident is commendable, mother's therapy, which involved switching providers so frequently that it appeared to impede her treatment, was hardly preventive of the referral

---

[2] To be sure, Y.M. disclaimed learning what mother said to the therapist to prompt the call to the police. However, given Y.M.'s age, her statements to DCFS, and the previous suicidal ideations that mother conveyed to her, Y.M. reasonably appeared to understand what had just transpired.

[3] Under the applicable standard of review, we must resolve the conflicting explanations for mother's failure to take her prescribed medication—that mother was unwilling to do so and that doctors did not feel it was necessary—against mother. (*I.J.*, *supra*, 56 Cal.4th at p. 773.)

incident.  Thus, her existing treatment plan was apparently inadequate to limit her symptoms.

Further, a nexus existed between those unresolved issues and a risk of physical harm to Y.M.  On the date of the referral incident, mother conveyed to her therapist a plan of killing herself that involved provoking a lethal response from law enforcement through gunfire.  Mother's threat was credible enough for her therapist to call in an immediate welfare check.  It was reasonable for the juvenile court to conclude that mother's threat, if carried out (and especially if done in the presence of Y.M., who was under her sole care at the time), would have had a substantial, adverse effect on Y.M.'s well-being, and would place Y.M. at substantial risk of physical harm.  Not only did mother risk Y.M. being caught in the middle of gunfire, she placed Y.M. in a position of being left alone, unsupervised and uncared for had mother acted in accordance with her suicidal ideations.

*Travis C.*, *supra*, 13 Cal.App.5th 1219 is instructive.  In that case, the mother suffered from serious mental health needs, including experiencing delusions and paranoia.  The mother did not consistently follow any treatment regimen and was not medication compliant.  (*Id*. at p. 1222.)  Maternal relatives would intervene at times, but the mother continued to spend significant periods of time with the children alone.  (*Ibid*.)  On appeal, the mother argued that her mental health needs were insufficient to support dependency jurisdiction and that any harm to the children stemming from her mental health needs was speculative.  The court of appeal affirmed the juvenile court's findings, and pointed to the following factors in support of jurisdiction: the mother had threatened suicide in the presence of the children in the past, had inconsistently sought treatment for

17

her mental health needs and was not compliant with her medication, and even though the maternal grandparents attempted to intervene when mother's episodes were particularly severe, mother still spent extended periods of time with the children alone and without support. (*Id.* at pp. 1225–1226.)

Like the mother in *Travis C.*, *supra*, 13 Cal.App.5th 1219, mother had threatened suicide in Y.M.'s presence in the past and was not medication compliant. Although mother sought mental health treatment, her pattern of constantly switching providers left her with no regular plan of treatment. And, mother had no support system in place and certainly no plan of care for Y.M. on the date of the referral when her escalating mental health needs came to a head. The evidence before the juvenile court was that Y.M. and mother were socially isolated from their Oregon-based family and friends to the degree that mother's family members were concerned about their welfare. Y.M. was homeschooled and mother's boyfriend's presence was infrequent due to his work. When mother was involuntarily hospitalized, Y.M. had no one to take care of her, which prompted the emergency referral to DCFS. Thus, the *degree* of potential harm to Y.M. was simply too grave to countenance under the circumstances, even if the *likelihood* of that harm occurring was to some extent lower. (See *I.J.*, *supra*, 56 Cal.4th at p. 778 [" '[s]ome risks may be substantial even if they carry a low degree of probability because the magnitude of the harm is potentially great' "]; cf. *A.L.*, *supra*, 18 Cal.App.5th at pp. 1045, 1047, 1050 [nexus insufficient where child was never alone with mother and father could—and did—act quickly to obtain necessary help]; *Joaquin C.*, *supra*, 15 Cal.App.5th at p. 563 [similar].)

And, even beyond the risk posed to Y.M. if mother followed through with her stated intentions during the referral incident, Y.M. had not had a physical exam for several years (roughly coinciding with the commencement of mother's mental health treatment in 2018) and lacked immunizations for an even longer period, despite mother's reports that Y.M. had no physical health issues.  (Cf. *Joaquin C.*, *supra*, 15 Cal.App.5th at pp. 562–563 [parent's attentiveness to child's health, including immunizations, despite mental health issues weighed against jurisdiction].)  Further, Y.M. reported being sad, and was unable to explain her sadness to anyone, except, possibly, mother, with whom Y.M. said she could discuss anything.  These statements underscore the exceptional nature of Y.M.'s isolation and the evolving harms to which she was subject as a result of mother's mental health struggles.  In other words, although Y.M. appeared to be of a sufficient age and intelligence to apprehend some of the risks associated with mother's mental health struggles, Y.M.'s apparent unwillingness to confide in others, and lack of access to such individuals, only heightened the risk to her well-being if and when mother had another episode.  (Cf. *A.L.*, *supra*, 18 Cal.App.5th at p. 1051 [jurisdiction unwarranted where 16-year-old's maturity and experience enabled him to deescalate mother's episodes].)

On this record, the juvenile court could reasonably infer that mother's suicidal ideations placed Y.M. at significant risk of physical harm as a bystander, thereby warranting jurisdiction under section 300, subdivision (b)(1).  (See *Travis C.*, *supra*, 13 Cal.App.5th at pp. 1226–1227; cf. *A.L.*, *supra*, 18 Cal.App.5th at p. 1051 [parent's family support and resumption of medication regimen demonstrated court's intervention no longer needed];

19

*Joaquin C.*, *supra*, 15 Cal.App.5th at p. 565 [similar].) As noted, neither DCFS nor the juvenile court was required to precisely predict the harm that would come to Y.M. (*Travis C.*, at pp. 1226–1227), or wait for that harm to actually befall her (*In re R.V.*, *supra*, 208 Cal.App.4th at p. 843). Rather, mother's "illness and choices" alone sufficed to "create a substantial risk of some serious physical harm or illness." (*Travis C.*, at p. 1227.)[4]

Mother attempts to undermine the jurisdictional finding by pointing to the various ways Y.M. minimized mother's mental health issues and that father and mother's family did not notice mother's mental health symptoms. Mother also argues that she "was absent for a simple night on a psychiatric hold" and that "[o]therwise, the minor was in no way at risk." However,

---

[4] To the extent that mother claims that, on the date of the jurisdictional findings, there was no *current* risk of harm to Y.M. (See generally, *In re Yolanda L.* (2017) 7 Cal.App.5th 987, 993 [when jurisdiction allegations are based solely on risk to the child, that risk must be shown to exist at the time of the jurisdiction finding]), she has failed to provide reasoned legal argument supporting that claim, and therefore has forfeited it on appeal. (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852.) Moreover, any such claim lacks merit. Although mother had been attending therapy on a weekly basis and was actively engaged in the therapeutic process by the time of the jurisdictional hearing, there is no indication in the record that mother had made any meaningful progress in addressing her complicated panoply of mental health diagnoses or delusions, or that mother was medication compliant. Simply attending therapy was not enough to eliminate the risk that her mental health needs presented to Y.M., as evidenced by the fact that mother had been attending therapy on and off for several years leading up the referral incident.

mother's contentions amount to a request that we reweigh the evidence and are inconsistent with the applicable standard of review. We must view the evidence in the light most favorable to the juvenile court's findings, and cannot reweigh the evidence. (*I.J.*, *supra*, 56 Cal.4th at p. 773.) Having identified substantial evidence supporting the exercise of jurisdiction, that other evidence or inferences drawn from the evidence might have supported a contrary finding "is of no consequence." (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 874, italics omitted.)

Here, as detailed above, there was ample evidence in the record to show that mother's serious and unresolved mental health needs, which culminated in a plan of suicide that involved possible gunfire, placed Y.M. at substantial risk of serious physical harm. Further, mother had taken inadequate protective measures to sufficiently mitigate that risk. As a result, we reject mother's contentions that the juvenile court's jurisdictional orders are not supported by substantial evidence.

Finally, as to disposition, mother argues that "[b]ecause the jurisdictional findings were unfounded, so were the dispositional orders and [a]n abuse of discretion." As set forth above, there was more than substantial evidence to support the jurisdictional findings. Because mother's only apparent quarrel with the dispositional orders is based on the alleged insufficiency of the evidence to support the jurisdictional findings, her challenge to the dispositional orders also fails. (*I.J.*, *supra*, 56 Cal.4th at p. 773.)[5]

---

[5] Mother briefly suggests this court should amend the jurisdictional orders to reflect the actual evidence of her mental health diagnoses, which her opening brief suggests was limited to

21

## DISPOSITION

The juvenile court's October 2021 jurisdictional and dispositional orders are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

NGUYEN (KIM), J.*

We concur:

EDMON, P. J.

LAVIN, J.

---

schizophrenia, and her reply brief suggests was limited to adjustment disorder and PTSD. Because mother declines to support her contradictory arguments with any legal authorities, and her arguments appear to lack record support, we decline to further address these claims. (See, e.g., *In re A.C.* (2017) 13 Cal.App.5th 661, 672 [argument unsupported by legal authorities is forfeited].)

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.