Filed 4/18/25  In re Kingston H. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Kingston H., a Person Coming Under the Juvenile Court Law. | B340531 |
| | (Los Angeles County Super. Ct. No. 24CCJP01241A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Appellant, | |
| v. | |
| R.H., | |
| Defendant and Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County, Mark A. Davis, Judge.  Affirmed.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Jessica S. Mitchell, Deputy County Counsel, for Plaintiff and Appellant.

Pamela Deavours, under appointment by the Court of Appeal, for Defendant and Respondent.

——————————————

The Los Angeles County Department of Children and Family Services (DCFS) filed a petition pursuant to Welfare and Institutions Code section 300, seeking dependency jurisdiction over then six-year-old Kingston H.[1]  The juvenile court dismissed the petition and the agency now appeals, contending the evidence did not support the juvenile court's order.  We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

In the early morning hours of April 18, 2024, Kingston left his apartment looking for his mother, R.H.  A neighbor found him alone in the courtyard of the apartment complex, crying.  The neighbor called the police.  Several officers from the Los Angeles Police Department responded to the call.  Upon arriving, one officer saw Kingston being pulled into a residence.  The officers knocked on the door.  Mother yelled at Kingston not to open the door, then attempted to refuse entry to the officers.  At the door, mother told the officers she felt unsafe, and she had just gotten out of the shower.  She repeatedly asked an officer to remove his foot from the doorway.  The officers entered the apartment.

The situation escalated.  Mother smelled of alcohol and marijuana.  She appeared to be under the influence.  Mother yelled and screamed at the officers.  They handcuffed her.  Kingston began screaming and crying.  Mother, using profanity, protested the officers being inside her home, repeated that she was not dressed, and demanded that they stop speaking to

---

[1]     All further undesignated statutory references are to the Welfare and Institutions Code.

Kingston. She said she was having a panic attack, she had recently had a therapy session, and she had another one scheduled.

At one point during the incident, mother fell to the floor, hit her head, and began bleeding.[2] The officers called an ambulance. Mother asked them to let her call the maternal grandmother so that she could come and take Kingston. The officers called DCFS. While mother was vehemently protesting the police officers' conduct, she spit on one of them. As an officer removed mother from her apartment she apologized repeatedly, asserting the spitting was an accident. The officer responded: "No, you're going to jail."

The police placed mother on a section 5150 hold. On admission to the hospital, mother was combative, uncooperative, and had to be restrained after she attempted to kick staff and tip over the gurney. Her blood alcohol level was 0.231. She also tested positive for marijuana. A DCFS social worker attempted to interview mother seven hours after she was "arrested." She was incoherent and could not provide any meaningful statements. She was held for eight days.

---

[2] According to the police report, mother was struggling and pulling away from an officer when she tripped and fell, causing the officer to also fall to the floor. Mother hit her head and suffered a cut to her face. The report indicated mother "continued to become agitated and at one point yelled that she's bipolar and was [feeling] anxious." The officer told a DCFS social worker he was attempting to remove mother's handcuffs when she pulled away and fell. In a transcript of bodycam footage from the April 18 incident, mother repeatedly asserted the officer had "banged [mother's] head" and "banged [her] on the floor."

DCFS detained Kingston and filed a dependency petition pursuant to section 300, subdivision (b). The petition alleged mother was unable to adequately supervise or protect Kingston because she had a history of mental and emotional problems; she had a history of substance abuse and was a current abuser of marijuana and alcohol; and she failed to make a plan for Kingston's care on April 18, 2024, when she was involuntarily hospitalized.

In an interview for the jurisdiction and disposition report, Kingston told a social worker that on the night of the incident, he woke up and mother had gone somewhere without telling him. He was looking for her outside. Mother had been drinking earlier. According to Kingston, mother bought alcohol every day and it made her " 'go crazy.' " When asked what crazy things mother did, he responded, " 'Drink. A lot of drinking. . . . Anytime I see her with a bottle I want to throw them away and she doesn't like it.' " He reported that mother told him not to tell anyone she drinks.

Maternal stepgrandfather was unaware of anything like the April 18 incident happening before. He said mother sometimes " '[said] something about being depressed,' " but he could not say she had a mental health problem. He was aware of mother drinking and had suggested she " 'slow down.' " He knew she had experimented with marijuana. He said mother was a good mother and took care of Kingston, although he opined that Kingston could use more structure.

Maternal grandmother had no personal knowledge of the April 18 incident. However, mother told her she was afraid when the police were in her apartment. Maternal grandmother had no knowledge of anything like the April 18 incident occurring before.

4

She said mother had not previously suffered from any mental health condition and she had not had concerns about mother's mental health. She knew mother drank occasionally, but she had never seen mother drunk and never had concerns about mother's drinking.[3] She thought what happened on April 18 was an isolated incident. Maternal grandmother felt mother was attentive and a good mother to Kingston. She explained that mother was a single mother, and she had been working two jobs until it became too stressful and she let one go. Maternal grandmother helped care for Kingston.

Mother said the April 18 incident was a " 'one-time thing' " and nothing similar had ever happened. She described herself as a social drinker, consuming alcohol around twice a week. Before the incident she had sought out therapy available to her through her work. She felt overwhelmed as a single mother and was looking for ways to calm down and find new coping skills. She had attended one therapy session before the incident. She explained she had never been diagnosed with a mental illness. According to mother, during the section 5150 hold " 'they said "bipolar" ' " and gave her medication while she was hospitalized.

Mother admitted that she had been drinking on the day of the incident and she ate some marijuana gummies. Kingston was sleeping and was safe. She went upstairs to a neighbor's apartment for five minutes, and five or 10 minutes later the police arrived. Mother asserted there was no reason for the

---

[3]     In the earlier detention report, DCFS reported maternal grandmother said "she was disappointed in mother and . . . she had told mother several times that she needs to change her behavior starting with not drinking alcohol because nothing good is going to come from drinking."

police to enter her home. She was wearing only a robe and they would not allow her to get dressed. She was scared, noting there were male officers in the home. She also feared they were trying to take Kingston. She denied spitting or kicking at the officers, explaining that she was missing a tooth and was talking passionately, so " 'it probably seemed like that.' "

Mother was employed. She and Kingston lived in a two bedroom apartment that was clean, organized, and free of hazards. Mother had no prior history of DCFS involvement.

The jurisdiction and disposition hearing was continued several times. In the meantime, mother had regular, appropriate visits with Kingston. There were no reports of mother appearing to be under the influence. Mother began attending a parenting program. She missed several random drug and alcohol tests, but returned negative results on the dates she tested, apart from one positive test for marijuana at a low level. Mother received individual counseling through her employer's employee assistance program. In July 2024, DCFS reported mother was unable to obtain alternative counseling services because there were no court orders in place, which some providers required to begin services.

Mother testified at the September 2024 jurisdiction hearing. She indicated that although she told a social worker that she was bipolar, she meant to say that she had been told she had symptoms of bipolar disorder. She denied having a bipolar diagnosis. At the time of the April 18 incident, she had attended three therapy sessions. Although a self-reported survey indicated mother had bipolar and PTSD symptoms, the therapist did not say mother had bipolar disorder. The therapist did not prescribe any medication for bipolar disorder and did not refer mother to a

6

psychiatrist or any other mental health professional.  Mother denied having any history of mental health conditions.  Mother had recently transferred to a new therapist.  She was only able to receive eight sessions with the prior therapist as the service was offered through her job.  Mother found the therapy helpful.

Mother admitted she was under the influence of alcohol on April 18.  She denied consuming any alcohol since then.  She realized her drinking was affecting Kingston and that it was not "helpful or healthy" for either of them.  She had attended approximately 20 virtual AA meetings when her work schedule allowed.  The meetings were helping her maintain her sobriety.

Mother also testified that she had been attending parenting classes and had completed eight or nine classes of a 12-session program.  She had learned useful information about child development.

Mother admitted on cross-examination that she sometimes felt depressed.  She explained that she most recently felt depressed because of the process of trying to regain custody of Kingston, which she found frustrating and "hard to deal with."  While hospitalized, mother took psychotropic medications, but she was no longer taking them.  She did not believe she was discharged with a prescription for any ongoing medication use.  Mother testified that since the incident, she had come to believe that she had an unhealthy relationship with alcohol, and it was not beneficial for Kingston or herself.  She did not have a formal AA sponsor and had not yet started sessions with her new therapist.  She denied having an ongoing desire to drink.  She also denied ever leaving Kingston unattended before the April 18 incident.

7

The juvenile court found the evidence did not establish that mother has a mental health issue or that she failed to make appropriate arrangements for Kingston's care.[4] As to the allegation that mother's substance abuse placed Kingston at risk of harm, the court found DCFS had not established any current risk. The court explained, in part, "I think mom has testified credibly. She's doing services, went out and got services on her own. I believe [that] she's learned that obviously drinking is not good. It has her here, had her separated from her son for five months. I don't find there's any current risk . . . ." The court thus dismissed the petition.

DCFS timely appealed.

## DISCUSSION

### The Evidence Did Not Compel a Finding of Jurisdiction as a Matter of Law

Section 300, subdivision (b)(1) "authorizes dependency jurisdiction if a child 'has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child.' [Citation.]" (*In re R.T.* (2017) 3 Cal.5th 622, 626–627, italics omitted.) "While evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances *at the time of the hearing* subject the child to the defined risk of harm. Thus,

---

[4]     The court indicated that while initially it found the actions of police offensive based on the reports, a review of the video indicated that although mother was "clearly drunk," both she and the police officers were polite at the outset of the interaction. The court noted: "I cast less aspersions upon the police conduct after seeing the video than I did after reading the reports."

previous acts of neglect, standing alone, do not establish a substantial risk of future harm; there must be some reason beyond mere speculation to believe they will reoccur." (*In re Emily L.* (2021) 73 Cal.App.5th 1, 15.)

On appeal, DCFS argues substantial evidence does not support the juvenile court's order dismissing the petition. The agency contends there was "ample evidence" that mother had a drinking problem, undisputed evidence of her mental and emotional problems, and evidence that both concerns were unresolved and placed Kingston at substantial risk of harm.[5]

However, the decision we are reviewing is the juvenile court's finding that DCFS did not meet its burden of proof below. "[W]here the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' [Citation.]" (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528 (*I.W.*), disapproved on other grounds in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.)

In this case, the evidence was neither uncontradicted, nor of such character that it left no room for the juvenile court's conclusion that it was insufficient to support a finding of jurisdiction.

---

[5] DCFS does not contend that the trial court erred in dismissing the petition based on the allegation that mother failed to make an appropriate plan for Kingston's care.

9

DCFS alleged that mother had a history of mental and emotional problems that placed Kingston at risk. However, the evidence that mother suffered from mental or emotional problems prior to the April 18 incident was minimal and contradicted. While intoxicated and engaged in an altercation with law enforcement, mother said she had been diagnosed with bipolar disorder. Yet, mother later denied that her prior statement was accurate. She indicated she had recently sought out therapy because she felt overwhelmed as a single parent, and she wanted to improve her coping skills. According to mother, a self-reported survey indicated she had symptoms of bipolar disorder and PTSD, but she denied receiving a formal diagnosis. Other than mother's own statement regarding an earlier diagnosis, there was no evidence of prior mental or emotional problems. The grandparents denied mother had a history of mental or emotional problems. There also was no evidence that prior to the April 18 incident mother had ever engaged in erratic or unstable behavior, or that her diagnosed or undiagnosed condition or conduct had ever placed Kingston at risk of harm. (*In re A.L.* (2017) 18 Cal.App.5th 1044, 1050–1051 [no basis for jurisdiction where, despite mother's mental illness and a single manic episode, children were well cared for].)

Further, although mother was involuntarily hospitalized, DCFS did not controvert her testimony that she was not prescribed any medication for ongoing use after her discharge, or that she was not diagnosed with a mental disorder in the hospital or after. Following the incident, mother returned to work, maintained a clean and organized home, and displayed no behavior suggesting unresolved mental or emotional problems. The evidence did not compel a finding as a matter of law that

10

mother had a history of mental or emotional problems, or that, even if mother had such conditions at the time of the hearing, they placed Kingston at ongoing substantial risk of suffering serious physical harm or illness. (*In re B.H.* (2024) 103 Cal.App.5th 469, 485 [jurisdiction requires some connection between parent's mental health issues and the risk of physical harm to child]; *In re A.G.* (2013) 220 Cal.App.4th 675, 684 [DCFS has the burden to show specifically how the minor has been or will be harmed; harm is not presumed from the mere fact of the parent's mental illness].)

As to the substance abuse count, the evidence was undisputed that mother had a single instance of extreme intoxication, during which she failed to supervise Kingston adequately, and which led to an altercation with law enforcement in Kingston's presence. But there was no evidence that mother had ever before engaged in such behavior while caring for Kingston.[6] Maternal grandmother did not believe mother had a drinking problem. Maternal stepgrandfather believed mother should "slow down" in her drinking, but he did not indicate that her alcohol consumption had ever rendered her unable to care for Kingston. Kingston said mother bought alcohol every day and did "crazy stuff," but he was unable to elaborate. Mother had no prior child welfare history. Other than the April 18 incident,

---

[6] The jurisdiction and disposition report indicated that in August 2019, mother was convicted of misdemeanor "disorderly conduct, intox drug/alcohol," pursuant to Penal Code section 647, subdivision (f). She received probation. DCFS offered no details about the conviction. There was no additional criminal history after August 2019.

11

there was no evidence that mother failed to adequately care for Kingston.

We also note that the juvenile court expressly found mother credible. According to mother, on April 18, she left Kingston unattended for only a few minutes when she believed he was asleep and went upstairs to a neighbor's apartment in the same complex. Although the situation was potentially dangerous, Kingston did not suffer actual physical harm or illness. Mother testified that she now recognized that drinking was not healthy for her or Kingston, she continued with therapy through her work and had initiated services with another mental health provider, and she was attending AA meetings to help her maintain her sobriety. Mother missed some drug and alcohol tests but returned negative results for alcohol for each test she took. The one positive marijuana test reflected low levels of the substance. Mother also had an explanation for the missed tests. Her visits with Kingston were regular and appropriate. As noted above, she had returned to work and maintained her home. Five months had passed since the incident without any further instances of mother engaging in behavior that would pose a risk to Kingston's safety.

A parent's substance abuse alone is not a basis for dependency jurisdiction. "Even with sufficient proof of substance abuse, the government also bears the burden of proving by a preponderance of the evidence . . . that this abuse makes the parent . . . unable to provide regular care for a child, and that this inability has caused a child to suffer serious physical harm or illness or places the child at substantial risk of serious physical harm or illness." (*In re N.R.* (2023) 15 Cal.5th 520, 550.) Here, it was not uncontroverted or overwhelmingly established

12

that, to the extent mother had a substance abuse problem, that substance abuse posed an ongoing substantial risk of harm to Kingston. Mother said the April 18 incident was an isolated occurrence. DCFS did not proffer evidence demonstrating this was untrue.

On appeal, DCFS highlights the evidence and inferences that would have supported an order finding Kingston to be a person described by section 300, subdivision (b). But our task is not to retry the case or to "review the record so as to recount evidence that supports [DCFS's] position . . . with the object of reevaluating the conflicting, competing evidence and revisiting the juvenile court's failure-of-proof conclusion." (*I.W.*, *supra*, 180 Cal.App.4th at p. 1528.) The evidence did not compel a finding as a matter of law that dependency jurisdiction was warranted.

## DISPOSITION

The juvenile court order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ADAMS, J.

We concur:

EDMON, P. J.

EGERTON, J.