Filed 3/21/25  In re Evelynn J. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re EVELYNN J. et al., Persons Coming Under Juvenile Court Law. | B338274 (Los Angeles County Super. Ct. No. 23CMJP00013) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>ERICA E.<br><br>        Defendant and Appellant. | |

        APPEAL from orders of the Superior Court of Los Angeles County, Ashley Price, Judge.  Affirmed.

Anuradha Khemka, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Veronica Randazzo, Deputy County Counsel, for Plaintiff and Respondent.

_____

In May 2024, the juvenile court partially sustained a petition brought by respondent Los Angeles Department of Children and Family Services (DCFS) under Welfare and Institutions Code section 300 and found five of appellant-mother Erica E.'s children to be dependents of the court.[1]  Mother appealed these orders.  In October 2024, the court entered juvenile custody orders granting joint legal and physical custody of the children to their respective parents and terminated jurisdiction.  Mother appealed these orders as well.  At her request, we consolidated the appeals.

Mother contends substantial evidence does not support the court's assumption of jurisdiction and, because we must reverse the court's jurisdictional order, we must also reverse its subsequent orders.  DCFS counters the appeal is moot because the court has terminated jurisdiction and there are no circumstances that warrant our discretionary review but, in any event, substantial evidence supports the court's assumption of jurisdiction.  We reach the merits of Mother's appeal and conclude substantial evidence supports the court's assumption of jurisdiction.  We therefore affirm.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

2

# FACTUAL AND PROCEDURAL BACKGROUND[2]

## A.    *The Family*

Mother has six children: Evelynn J. (born August 2012); Evan J. (born April 2014); Phillip J., Jr. (born February 2015); Ki.M. (born June 2019); Ko.M. (born May 2020); and Bobbie J. (born January 2022).  Phillip J., Sr., is the father of Evelynn, Evan, Phillip Jr., and Ki.M.  Robert M. is the father of Ko.M. Roberto J. is the father of Bobbie.[3]

## B.    *Prior Child Welfare History*

In 2011, Mother was convicted of possessing, using, and being under the influence of controlled substances.

In June 2015, the court sustained a petition under section 300, subdivision (b)(1), as to Evelynn, Evan, and Phillip Jr., which alleged that Mother had an unresolved history of illicit drug use, that Phillip Jr. had been born with a positive toxicology screen for methamphetamine, and that Mother and Phillip Sr. had a "history of unresolved domestic disputes" in the children's presence.[4]  In October 2015, the court placed Evan and Phillip Jr. with Mother under DCFS supervision.  In December 2015, the court placed Evelynn with Mother, again under DCFS supervision.

---

[2] We limit our summary to the facts and procedural history relevant to the issues appellant raises on appeal.

[3] None of the fathers is a party to this appeal.

[4] The party who made the referral to DCFS claimed that Mother "obtained no prenatal care knowing that she would test positive for drugs during her pregnancy."

In May 2016, DCFS filed a section 387 petition "due to the mother's relapse." Mother entered a residential treatment program. In July 2016, the court returned the children to Mother under DCFS supervision, on the condition that Mother remained in her treatment program. In February 2017, the court ordered both Mother and Phillip Sr. to "stay away from each other's home, place of employment or school, and place of worship."

In May 2017, DCFS filed a section 387 petition "due to the mother's relapse and violation of the court Stay Away Order." Mother consented to the children's removal, and the children were placed in foster care. In August 2017, the court sustained the petition, which alleged that Mother had a history of substance abuse and was "a current abuser of methamphetamine and marijuana," and that in May 2017, Mother had tested positive for methamphetamine and marijuana while the children were in her care.

In September 2018, the court released Evelynn and Evan to Mother. In April 2019, the court released Phillip Jr. to her. In June 2019, the court issued a juvenile custody order granting Mother sole legal and physical custody of Evelynn, Evan, and Phillip Jr.; Phillip Sr. was granted monitored visits. Phillip Sr. was also to "complete drug abuse treatment program with random drug testing, domestic violence treatment program for offender, individual counseling, and fatherhood program." The court terminated jurisdiction in July 2019.

## C.   *DCFS Investigates Referrals*

### 1.    DCFS Investigates the Initial Referral

In October 2023, DCFS received a referral alleging that Roberto J. was emotionally abusing the children. Law

enforcement had responded to a call for "a verbal domestic violence incident." When law enforcement spoke with Mother, she stated Roberto J. "pushed her and caused a scratch across her chest." However, according to the DCFS report, "Mother was observed to be 'incoherent,' meaning she could not provide pertinent details as to how [Roberto J.] pushed her. Mother changed her story a few times."[5]

In November 2023, a children's social worker (CSW) spoke with Mother about the incident. Mother stated that she and Roberto J. were in an "on and off relationship," and that he stayed over at her house sometimes. He helped with the children, and together they had been trying to co-parent their daughter Bobbie. As for the incident that occasioned the referral, Mother stated she and Roberto J. had been "arguing over something stupid," and he "pushed her with his body and stepped on her foot." Mother wanted him to leave but he refused to leave without Bobbie. Mother called 911. Before the police arrived, Roberto J. left with Bobbie. Mother claimed she was nervous when speaking with law enforcement—not incoherent—because she did not want the police to contact DCFS.[6] Evelynn, Evan, and Phillip Jr. were at school during the incident, and the other three children were napping.

Mother confirmed that she had a history of substance abuse, and that methamphetamine was her "drug of choice," but claimed that she had not used any drugs since 2019. However, she refused to submit to a drug test. ~(CT 39)~ Mother also

---

[5] The report does not specify who made these observations.

[6] The police report confirmed that Mother "was not desirous of prosecution because she did not want DCFS to be notified."

stated she had been diagnosed with post-traumatic stress disorder and depression.

The CSW interviewed Evelynn, Evan, and Phillip Jr.[7] None of them saw the incident or knew anything about fights or arguments between Mother and Roberto J. All three children denied any abuse and stated there was "always enough food to eat in the home."

Two weeks later, the CSW was able to speak with Roberto J. Regarding the incident, he stated he had been at Mother's home, and she "seemed frustrated." Roberto J. decided to leave because he "didn't want to deal with mother's attitude." Mother did not want him to leave with Bobbie, but he did anyway. Roberto J. stated Mother was standing at the door trying to prevent him from leaving so he may have "pushed past" her but denied causing her any harm.

### 2.     DCFS Investigates a Second Referral

Eleven days after speaking with Mother and the children, DCFS received an "Info to CSW," describing a new incident. Mother and maternal great-aunt Bryn each called the sheriff's department, accusing each other of theft.[8] When a deputy responded, Mother was on the street and appeared "paranoid and "in[]coherent." While the deputy was speaking with her, Phillip Sr. arrived to supervise the children. A CSW spoke with law enforcement, Phillip Sr., Evelynn, Evan, Phillip Jr., and Mother.

---

[7] Ki.M. and Ko.M. were too young to be interviewed, and Bobbie was with Roberto J.

[8] The sheriff's report stated that Bryn was Mother's sister, but in a letter that Bryn later wrote on Mother's behalf, Bryn confirmed she was Mother's aunt.

6

### (a)  Law Enforcement

A deputy informed the CSW that Mother would be hospitalized because she was being "paranoid, non-compliant, [and] screaming out things that made no sense."  The deputy added that Mother informed him that she recently had relapsed.

### (b)  Phillip Sr.

Phillip Sr. explained that Evelynn had called him and asked him to come get her and her siblings "before the police took them."  Phillip Sr. told the CSW that Mother "reported she believed the neighbors did witchcraft and she believed [Roberto J.] had hired them."  Phillip Sr. added that the maternal grandmother had recently passed away and Mother suddenly started behaving differently.

Phillip Sr. reported the last time he used methamphetamine was nine years ago and was now "clean" and willing to drug test.  He denied any current domestic violence issues but stated Mother had previously reported domestic violence between the two but the charges were dropped due to insufficient evidence.

### (c)  Evelynn

Evelynn related that Mother had originally called Bryn for help to get into rehab, but then Mother "snapped."  The two started arguing and Mother took Bryn's laptop and phone; when Bryn tried to get her items back, Mother grabbed Bryn's breasts and said, "That's why you have cancer, I hope you die."  Mother then commanded Evelynn, "Get me a knife[,] I'm going to stab this bitch."  Bryn called the police.  After Mother was handcuffed and placed in the police car, she was "banging her head inside the

police car, knocking on the window, and kept yelling 'Don't talk to them, don't tell them anything.' "

Evelynn confirmed her maternal grandmother passed away earlier that week and "[M]other began to act weird." For example, Mother reported she had seen someone in her car, called Phillip Jr. into her room and told him scary things, tried to put Phillip Jr. in the attic, and told the children "someone is watching them" and would scream out, "get out of my fucking house." Evelynn added that Mother had been "creeping us out, calling us bitches."

Evelynn stated that Mother "had trained her and her siblings on what to say," and admitted she had lied to a previous social worker. The day that social worker visited, Mother pulled Evelynn out of school early to help clean the house. Evelynn stated that "sometimes" there was food for the children to eat. Evelynn knew what drugs were and told the CSW that Mother had taken the children "through a drive through [*sic*] that had a green cross," where she purchased "green balls that looked like dirt and smelled funny." Mother then "wrapped it in a brown wrapper and smoked it in the laundry room."

When asked how Mother disciplined her, Evelynn said Mother would "pull her hair and spank her." She also reported that Mother "socked her in the face and busted her lip" and "bit her ear and Phillip's ear." She added that Roberto J. sometimes beat Evan, or "pinned" him down while Mother beat him.

### (d)   Evan

Evan stated he was being dropped off from school when he saw Mother in the police car screaming for help. Evan confirmed that Mother had been acting differently the past two weeks. He stated, "Mom told me she saw someone in the car with white big

8

eyes" and added, "[i]f I touch my face or arms, or scratch myself my mom will tell me you're up to something with Bobbie." Evan claimed there was "always" food to eat at home.[9] Evan did not know what drugs were but had seen Mother "vaping" before.

### (e) Phillip Jr.

Phillip Jr. stated that he heard Mother call Bryn asking for help to find a social worker because she needed a break from the children. Bryn arrived, and Mother yelled, "You did this, you called the other social worker, and you are planning with the social worker to take my children. You're haunting me." Mother took Bryn's phone and computer, and Bryn called the police using a neighbor's phone. As Bryn was calling, Mother was singing the "ABC's"; Phillip Jr. described it as "not natural." After the police placed Mother into the police car, Phillip Jr. heard Mother yell, "Watch[,] you're going to regret it in the night." Phillip Jr. confirmed that Mother believed the neighbors "do witchcraft" and added that she began acting "cra[z]y" after the death of the maternal grandmother. For example, Mother had been "making him and his siblings sit on their hands and not move because she believed cameras and microphones were watching them through the walls." In the past week, Mother called him into her room—which was pitch black—and she sat across from him and just stared at him. Mother would sit in front of Phillip Jr. and tell

---

[9] In the CSW's home assessment, she noticed that the home had "limited food." She also noticed a bedroom with "food items out with trash and fruit flies covering it," a sink "over[]loaded with dirty dishes," and "two black trash bags . . . underneath the dining table."

him to "watch out for the night lady" and "sing the ABC's in a deep creepy voice to scare me."

Mother did not allow them to get food from the refrigerator when they were hungry; she told him and his siblings that she would starve them. Phillip Jr. stated that he sometimes went to bed hungry, and that there were times that Mother did not go grocery shopping so the family "just starve[d]."

Phillip Jr. did not know what drugs were but confirmed that Mother vaped. Mother told him and his siblings, "If you guys keep making me frustrated to the point I need to smoke or drink, I will do it."

### (f) Mother

A CSW spoke with Mother three days after the incident. Mother refused to let the CSW into the house so the two spoke outside. Mother did not want to discuss the incident with Bryn. Mother stated the children were with their fathers and she would like for them to remain there for the time being. Mother denied any issues with her mental health, stating she was simply trying to grieve the death of her mother. A "Client Aftercare Plan" obtained from Exodus Recovery showed that Mother was discharged a day after being brought to the hospital with "referral[s] to mental health resources" and a prescription for hydroxyzine for "anxiety/insomnia." Mother agreed to drug test the next day; the test occurred two days later, and Mother tested negative for drugs and alcohol.

### D. *DCFS Files a Petition*

At the end of November 2023, Mother asked that the four elder children be returned to her. Phillip Sr., Robert M., and the therapist for Evelynn and Evan stated that Mother had been

10

attending Narcotics Anonymous meetings, and the therapist added that Mother had been prescribed psychiatric medication and "appeared fine." Mother also stated that she "look[ed] forward to continuing her mental health treatment, as well as regularly attending NA meetings at least twice per day." DCFS agreed to the return of the elder children but stated it would file a "non-detained" petition.

In December 2023, DCFS filed a petition on behalf of all the children pursuant to section 300, subdivisions (a) and (b)(1). The petition indicated the children were "not detained." Counts a-1 and b-1 identically alleged that, in October 2023, Mother and Roberto J. "engaged in a violent verbal and physical altercation in the children's home" when Roberto J. "pushed the mother with the father's body and stepped on the mother's foot[,] causing the mother to sustain a mark on the mother's chest and redness to the mother's toe." The b-1 count added the allegation that Mother failed to protect the children by allowing Roberto J. to have unlimited access to the children. Count b-2 alleged that Mother "has current mental and emotional problems, including a diagnosis of PTSD, depression, and Unspecified Mood (Affective) Disorder, and is exhibiting paranoid behavior, which renders the mother unable to provide regular care of the children." The count added that, in November 2023, Mother "was hospitalized for the evaluation and treatment of the mother's psychiatric condition," that Mother had instructed one of her children to bring her "a knife to stab the maternal [great] aunt Bryn," that Mother had previously "believed the neighbors practiced witchcraft," and that Mother had previously "had the children sit on their hands because the mother believed cameras and microphones were watching them through the walls."

The court found a prima facie case that the children were persons described by section 300 and ordered them released to their parents under DCFS supervision. Evelynn, Evan, Phillip Jr., and Ki.M. were placed with Mother, Ko.M. was placed with Robert M., and Bobbie was placed with Roberto J.

### E. DCFS Continues to Investigate

A dependency investigator (DI) spoke several times with Mother, Evelynn, Evan, Phillip Jr., and the three fathers.

#### 1. Mother

In January 2024, Mother told the DI that she realized she needed to be on medication to help with her mental health. Before taking medication, she felt the world was "out to get" her. Mother stated she had "bipolar stage 1," and that she understood "it starts with small episodes before there is a big blow out." Mother confirmed the need to take her medication and continue to go to her meetings. She also said she wished she could count on the children's fathers to co-parent so she would be less stressed. Mother stated she was receiving mental health services from a behavioral health center. She admitted that Robert M. used to take Bobbie from her to protect Bobbie.

Mother provided the DI with a letter that Bryn had written on Mother's behalf, expressing forgiveness toward Mother, her understanding of the difficulties Mother faced, and her admiration for how Mother cared for her children. Bryn confirmed that she had written the letter.

At the end of February 2024, Mother's "treating Psychiatric Mental Health Nurse Practitioner" wrote a letter stating that Mother was diagnosed with bipolar disorder, "which limits her ability to do major life activities and work."

On March 22, 2024, Mother told a CSW that she was not taking her medication. However, on April 11, Mother reported she had resumed taking her medication after further discussions with her psychiatrist. In late April 2024, Mother's psychiatrist reported that she showed up to every appointment and that she had no reason to think Mother was not taking her medication. Mother consistently tested negative for drugs.

On March 27, 2024, DCFS received a referral from the Child Protection Hotline alleging that Mother hit Phillip Jr. in the head with a baby chair on some unknown date, and also hit him with "hangers" the day before the referral; Phillip Jr. claimed the "hangers" did not hurt and did not cause any marks or bleeding. One month later, DCFS closed the referral as "unfounded due to everyone denying physical abuse allegations."

### 2. Evelynn

In January 2024, when asked about the incident between Mother and Bryn, Evelynn stated that, after Mother "kicked [Bryn] out of the house," Mother looked through Bryn's bag and, when Evelynn told her to stop, Mother told her to put her hands under her legs. Mother then instructed Evelynn to take her bra off "because she thought it had a camera." Evelynn complied to keep Mother calm, as Mother's actions were scaring her. Mother could not find her car keys and so looked through Bryn's bag for Bryn's car keys. When she found them, Mother tried to leave with Phillip Jr. and Ki.M., but Evelynn prevented her from taking the children. Mother took Evelynn's phone because she did not want Evelynn to call Phillip Sr. Then the police arrived and Mother was arrested. Evelynn understood that Mother was taken to a hospital.

13

After Mother was discharged, Evelynn stated that Robert M. came to help Mother, and Mother tried to take Ko.M. out of his car seat while the car was moving.

Evelynn related that, in the past, Mother would be "humming songs and knocking on the bathroom walls," stating that she heard Phillip Sr. and Robert M. "talking in the walls." One time, while Evelynn was in the shower, Mother walked in to ask Evelynn who she was talking to; although Evelynn was not talking to anyone, Mother continued asking. Because Evelynn "gave her attitude," Mother "snapped [Evelynn's] phone in half." However, now that Mother was on medication, Evelynn believed she was doing better.

### 3. Evan and Phillip Jr.

Evan's knowledge of the incident came from what he was told by his siblings.

When asked why he thought social workers were speaking with him and his family, Phillip Jr. responded, "My mom started to say stop moving your hands because she said I was using sign language to communicate with Evan. Then my mom was going poop poop [*sic*] and she said there were people in the walls. My aunt came and my mom got into a fight and had my aunt's bag. I think she called the police and they took my mom to the hospital. When my mom said there were people in the walls, I was scared. One time, my mom came in at night and the lights were off and her eyes were white. I[t] was dark and I was scared."

### 4. Robert M.

Robert M. disputed Evelynn's statement that Mother had tried to remove Ko.M. from his car seat. He explained that Mother had stayed with him for a day after being released from

14

the hospital and, as he was driving her home, she got out of the car at a stop sign. She did not try to take Ko.M. with her.

### 5. Roberto J.

Roberto J. initially ignored several attempts made by the DI to speak with him about the allegations. Earlier, when a CSW had discussed a visitation schedule with him, Roberto J. stated he was uncomfortable with Mother being alone with Bobbie, both due to the incident with Bryn and due to the side effects he believed resulted from the medication Mother was taking. Roberto J. also expressed concern about some of Mother's other children, such as Evan, who was often sent home from school for being "aggressive and violent," and who "pulled a hammer, threatened people, has made a hole in the kitchen wall, ripped up the baby monitor, cussing out [Roberto J.], and thrown plastic piping." Roberto J. eventually agreed that Mother could have custody of Bobbie for four-and-a-half hours, three days a week. When told of Roberto J.'s concerns, Mother claimed he was being "petty." She stated her medication did not hinder her ability to parent, and that while Evan did have tantrums, she could redirect him. Mother stated that while she was in the process of stabilizing her mental health, she wanted only a weekly, four-hour visit with Bobbie.

Although Roberto J. had agreed to leave Bobbie with Mother, he evidently changed his mind and refused to do so—while he sometimes brought Bobbie to Mother's home, he would stay with her the entire time. He refused to let Mother hold Bobbie and refused to let the other children see her; when he brought Bobbie to Mother's home, he would enter with Bobbie's face covered by a blanket and proceed directly into a bedroom, shutting the door behind him. At a February 2024 hearing, the

15

court ordered that Mother be given her unmonitored parenting time.

In March 2024, the DI was finally able to speak with Roberto J. about the case. Regarding the incident in the initial referral, he stated he had returned to the house after the police arrived and that if he had "done something" to Mother, the police would have "taken" him—but they left. Regarding Mother's mental health, Roberto J. said that, after Mother had been discharged from the hospital, she called him from a train station, saying that she "got into it" with Robert M. and "jumped out of the car." When Roberto J. picked her up, she was "out of it and her perception was that everyone was out to get her." Mother was scared to return to her home because she thought Phillip Sr. was there. Her house was "trashed."

Roberto J. said before Mother started taking medication, "she would be loud and yelling in front of my face, and would get physical. She would also start hitting herself. She threw a rock through my window and trashed my car. Now that she's on medication, I've notice[d] she appears mellow, talks, and jokes around. Before she would get easily offended and would think everyone was out to get her."

On March 8, a CSW informed Roberto J. that Mother would be transitioning to "overnight parenting." Roberto J. objected, stating that Mother had informed him "she was not taking the medication as prescribed, and would take it at a later time during the day." Roberto J. refused to permit Bobbie to stay with Mother overnight.

### 6. Phillip Sr.

In May 2024, Mother complained that she was the only one transporting the children to and from Phillip Sr. Phillip Sr.

reported that he wanted Mother to be present whenever Ki.M. was visiting, because he was unable to control Ki.M. "when [Ki.M.] is triggered and has temper tantrums in public." Phillip Sr. also expressed concerns that Mother sometimes left the children home alone. Mother admitted to this, but claimed she was told by social workers and police officers she could leave the children home alone with Evelynn.

### F.  *Adjudication and Disposition*

At the May 2024 adjudication hearing, Mother's counsel argued that her mental health issues stemmed from the death of her mother, and that Mother had acted swiftly and appropriately to address the issues. Therefore, the court should dismiss the petition as to Mother because she was stable and posed no current risk to the children.

Robert M.'s counsel asked the court to dismiss Ko.M. from the petition because Ko.M. lived primarily with Robert M., who was non-offending, and there was no evidence that Ko.M. was at risk. Roberto J.'s counsel asked the court to dismiss the petition as to Bobbie because there was no threat of further domestic violence and because Roberto J. and Mother were successfully co-parenting Bobbie.

The children's counsel asked the court to dismiss counts a-1 and b-1 (relating to the domestic violence) for lack of current risk. Counsel asked the court to sustain count b-2 (relating to Mother's mental health) but consider ordering services under section 360, subdivision (b), rather than finding the children dependents of the court, because Mother had sufficiently mitigated the circumstances that had given rise to the petition. However, counsel did not think the court should terminate jurisdiction due to the "severity of the mental health break[]down that did occur."

17

DCFS's counsel asked the court to sustain the petition as pled. As to the domestic violence allegations, counsel pointed to Mother's initial statements that Roberto J. pushed her and stepped on her toes and argued that her later denials of domestic violence were false. As to Mother's mental health, counsel recounted the evidence of Mother's paranoia and delusions, which had been ongoing for some time. Counsel also pointed out that Mother had recently stopped taking her medication for approximately three weeks.

The court dismissed Ko.M. from the petition, striking allegations relating to him. It also found that DCFS had not met its burden on counts a-1 and b-1. However, as to Mother's mental health issues, the court found that her "recent stabilization is just that[:] recent." Taking into account Mother's mental health issues, the effect of Mother's delusions and paranoia on the children, and Mother's admission to law enforcement that she had "relapsed," the court sustained count b-2. While the court "very seriously" considered ordering services under section 360, subdivision (b), it stated it was "just . . . not comfortable doing that today," due to the co-parenting challenges, and Mother's "lingering substance abuse history." Therefore, the court found the remaining children to be dependents of the court and set a three-month follow-up hearing to consider terminating jurisdiction. All children were ordered to remain "home of parents." Mother was ordered to take a parenting class, continue with individual counseling, take all prescribed psychotropic medications, and to drug test on reasonable suspicion.

Mother timely appealed the court's jurisdictional and dispositional orders as to Evelynn, Evan, Phillip Jr., Ki.M., and Bobbie.

18

### G.     *The Court Terminates Jurisdiction*

In an August 2024 status report, DCFS reported that Mother was doing well, addressing her children's needs, and keeping up with her NA meetings, with counseling, and with taking prescribed medication.  DCFS concluded that "there are no children likely to be in immediate danger of serious harm" and that "the concerns that brought the family to the attention of DCFS have been mitigated."

At an August 2024 hearing, the court advised its intent to terminate jurisdiction and grant joint custody to the children's respective parents.  No parties objected.  The court terminated jurisdiction as to all remaining children, pending receipt of juvenile custody orders.  In October 2024, the court entered juvenile custody orders granting joint legal and physical custody of the children to their respective parents and terminated jurisdiction.  Mother timely appealed the "Final custody and termination orders."

In December 2024, we granted Mother's motion to consolidate her two appeals.

## DISCUSSION

### A.     *We Consider the Merits of Mother's Appeal*

DCFS contends we should dismiss Mother's appeal as moot. We decline to do so.  "[W]e generally will exercise our discretion and reach the merits of a challenge to any jurisdictional finding when the finding (1) serves as the basis for dispositional orders that are also challenged on appeal [citation]; (2) could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings [citations]; or (3) 'could have other consequences for [the appellant], beyond jurisdiction'

19

[citation]." (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762.) Here, Mother challenges the dispositional orders based on the jurisdictional finding.  The findings could also prejudice Mother and have consequences beyond jurisdiction:  Mother has been a party in two child welfare cases, and the record in this case demonstrates she has had issues co-parenting with at least two of her children's fathers.  There is the potential that Mother will be involved in future dependency cases as well as in family law cases with one or more of the fathers; in all such instances, a sustained petition could prejudice Mother.  Accordingly, we exercise our discretion to reach the merits of Mother's appeal.

**B.** ***Substantial Evidence Supports the Court's Findings***

We review jurisdictional findings for substantial evidence. (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1161–1162.)  "In a challenge to the sufficiency of the evidence to support a jurisdictional finding, the issue is whether there is evidence, contradicted or uncontradicted, to support the finding.  In making that determination, the reviewing court reviews the record in the light most favorable to the challenged order, resolving conflicts in the evidence in favor of that order, and giving the evidence reasonable inferences.  Weighing evidence, assessing credibility, and resolving conflicts in evidence and in the inferences to be drawn from evidence are the domain of the trial court, not the reviewing court.  Evidence from a single witness, even a party, can be sufficient to support the trial court's findings." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 450–451.)

The court found Mother's paranoid delusions and other mental health issues placed the children at risk.  Ample evidence supports that finding.  Evelynn had to remove her bra because

20

Mother believed there was a camera in it. The children went hungry at times because Mother did not buy or cook food and threatened the children she would "starve them." Mother forced Phillip Jr. to sit in a dark room and would stare at him or tell him to "watch out for the night lady." She also sang "the ABC's in a deep creepy voice to scare" him. She accused her children of conspiring with each other and made them sit on their hands, motionless, because "cameras and microphones were watching them through the walls." She took Evelynn's phone to prevent her from calling her father and broke it in half when Evelynn gave her "attitude." Mother told Evelynn to bring her a knife so that she could stab the maternal great-aunt Bryn. These incidents, coupled with Mother's other delusions (such as her belief that the neighbors were performing witchcraft against her) constitute substantial evidence to support the court's finding that, untreated, Mother's mental health issues placed the children at substantial risk of harm.

While the court also found that, at the time of the adjudication hearing, Mother's mental health had seemingly stabilized, it characterized the stabilization as too "recent" to outweigh the history of Mother's substance abuse and relapses, as well as her behavior toward the children caused by her previous delusions. Considerable evidence supports this finding as well. It is undisputed that just two months before the adjudication hearing, Mother stopped taking her medication for approximately three weeks. Further, Mother admitted to law enforcement that she had "relapsed" and asked Bryn to come help her "get into rehab." This was not the first time Mother had "relapsed"—in a previous child welfare case, DCFS filed two section 387 petitions due to Mother relapsing in May 2016 and in

21

May 2017.  Mother also told her children: "If you guys keep making me frustrated to the point I need to smoke or drink, I will do it."

Mother disputes none of this evidence on appeal.  Instead, she argues that substantial evidence supports the conclusion that her children were not at risk at the time of the hearing.  Even if that were true, it is irrelevant.  " ' " '[W]hen two or more inferences can reasonably be deduced from the facts,' either deduction will be supported by substantial evidence, and a 'reviewing court is without power to substitute its deductions for those of the trial court.' " ' " (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545.)  In short, the fact that portions of the record may have supported a finding that the children were not at risk does not negate the evidence that supports the finding the children were at risk.

Mother's citation to *In re A.L.* (2017) 18 Cal.App.5th 1044 is inapposite.  There, the mother had paranoid delusions that people were trying to poison her and, during one such episode, threw a shoe that "touched" her 11-year-old daughter's arm.  (*Id.* at pp. 1046–1047.)  However, the children were never alone with the mother (either the father or paternal grandmother was always home), and the mother's 15-year-old son was capable of restraining her.  (*Ibid.*)  Additionally, the evidence showed that the children were well cared for despite the mother's mental health issues.  (*Id.* at p. 1051.)

Here, by contrast, the children were frequently alone with Mother.  When Mother's mental health issues arose, they were not well cared for—Mother demanded Evelynn take off an undergarment, forced the children to sit on their hands, ordered Phillip Jr. to sit in a dark room while she scared him, and

22

sometimes told the children she would starve them.  The oldest child, Evelynn, was not a 15-year-old capable of restraining Mother, but only an 11-year-old whose phone Mother snapped in half.  Additionally, Mother had at least four other children in her care, one of whom was barely 2 years old.  Unlike in *A.L.*, this was not a situation where Mother's mental health issues were well managed by the rest of the family, and where the children could protect themselves from Mother should the need arise.  This was a situation where the children would be at substantial risk of harm should Mother's mental health issues flare up again.  A juvenile court " 'need not wait until a child is seriously abused or injured to . . . take the steps necessary to protect the child.' " (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

On this record, we hold that substantial evidence supports the court's assumption of jurisdiction.  Because Mother's only argument for why the court erred in its subsequent orders is that it erroneously assumed jurisdiction, she has also failed to demonstrate error in those subsequent orders.

## DISPOSITION

The court's orders are affirmed.
NOT TO BE PUBLISHED

M. KIM, J.

We concur:

ROTHSCHILD, P. J.          BENDIX, J.

23