Filed 3/13/26  In re J.A. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| In re J.A. et al., Persons Coming Under the Juvenile Court Law. | B340823 |
| | (Los Angeles County Super. Ct. No. 24CCJP02064A-B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| JACQUELINE A., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Cristina Gutierrez Legaspi, Judge. Affirmed and remanded with directions.

Benjamin Ekenes, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Brian Mahler, Deputy County Counsel, for Plaintiff and Respondent.

_____

## INTRODUCTION

Jacqueline A., the mother of minors J.A. (born 2010) and J.M. (born 2018), appeals the juvenile court's jurisdiction and disposition order and its final custody order upon terminating jurisdiction. Jacqueline contends the juvenile court lacked substantial evidence to sustain the jurisdictional allegations. We conclude there was substantial evidence the children were at a risk of future serious physical harm or illness as required for jurisdiction under Welfare and Institutions Code section 300, subdivision (b)(1).[1]

## FACTUAL AND PROCEDURAL BACKGROUND

A.  *The Dependency Petition and Detention Proceedings*

In July 2024, the Los Angeles Department of Children and Family Services (Department) filed a section 300 dependency petition alleging Jacqueline failed to protect J.A. and J.M. (§ 300, subd. (b)(1)). The Department alleged that Jacqueline "has a history of mental and emotional problems, including diagnoses of

_____

[1]  Undesignated statutory references are to the Welfare and Institutions Code.

2

Schizoaffective Disorder Bipolar Type, self reported diagnoses of ADHD, Major Depressive Disorder, Anxiety, OCD and PTSD, [and] a history [of] psychiatric hospitalizations and hallucinations, which renders the mother incapable of providing regular care and supervision of the children." The petition further alleged that Jacqueline "has a history of substance abuse including alcohol and is a current abuser of methamphetamine, cocaine, marijuana and alcohol, which renders the mother incapable of providing the children with regular care and supervision." The petition alleged Jacqueline's mental illness and substance abuse "endangers the children's physical health and safety and places the children at risk of serious physical harm, damage and danger."

The Department subsequently filed a detention report. The Department reported that J.M.'s father was Juan M. Juan and Jacqueline married in 2016, and lived together with J.A. and J.M. J.A.'s biological father was Rene G., but he had "not had any contact with [J.A.] over the past ten years." At the time of the report, J.A. was 14 years old and J.M. was six years old.

The report described that on June 4, 2024, the Department received a referral alleging sexual abuse of J.M. by Juan and general neglect of J.M. and J.A. by Jacqueline. The referral described that Jacqueline had been homeless since she had an argument with Juan in November 2023. According to the referral, in 2023, when Jacqueline was bathing J.M., J.M. accused Juan of "touch[ing] her in her vagina, anus and breasts and kiss[ing] her in her vagina." Jacqueline confronted Juan "about the alleged sexual abuse," and Juan kicked Jacqueline out of the family home. Juan had been taking care of J.M. and J.A. since November 2023. Jacqueline "claimed she previously

3

reported the alleged sexual abuse . . . and filed a police report," but could not provide further details.

The Department investigated the referral and spoke with Juan on June 4, 2024. Juan stated that Jacqueline "has ongoing mental health issues that created an unsafe environment for the children," and that he told Jacqueline "she cannot return to the home until she receives help for her mental health needs." According to Juan, Jacqueline had been "diagnosed with bi-polar and borderline personality disorder" and deemed " 'gravely disabled' by her mental illness," but "she does not want to accept it." Juan described that "approximately two days after Thanksgiving [2023], [Jacqueline] had a mental health 'episode' " where she became "physically aggressive with [the] maternal grandfather" in the family home and was "placed on a psychiatric hold by law enforcement." Juan stated that "after that incident, he had to choose the children." Juan reported that there were additional "past incidents of [Jacqueline] pushing him during a mental health 'episode,' " causing him to "walk away or call the police." Juan denied any sexual or physical abuse of the children and any substance use, and he told the Department he was "not surprised by [Jacqueline's] allegation" because Jacqueline "has threatened to make false reports against him 'whenever she does not get her way.' "

Juan reported that Jacqueline was currently homeless and living with a boyfriend, she "sleeps on the streets in different homeless encampments," and that he believed Jacqueline was "currently in the hospital." Juan also reported that Jacqueline told him she had "used methamphetamines." According to Juan, he used to bring Jacqueline food and "supplies" when she was hospitalized or living in a homeless encampment, but he had not

4

seen her for " 'months' " since he encountered Jacqueline's "aggressive" dog and learned her encampment "was controlled by a local gang." Juan stated he planned to divorce Jacqueline and "gain custody of [J.A.]," but currently "there is no family law order for the children" and "no outstanding restraining order between him and mother."

The Department also spoke with J.A. and J.M. J.M. stated her mother was "at the hospital because she is 'sick' " and could not "recall the last time she saw or talked to her mother." J.M. "denied anyone touching her on her private parts," "anyone kissing her private parts," or "any forms of sexual abuse." J.M. also stated that "when her mother lived at the home, she 'use[d] to hit [Juan]' " but Juan did not hit Jacqueline.

J.A. reported he did not have contact with his mother or his biological father, but he got along well with his stepfather Juan, he did not experience any abuse or neglect from Juan, and he felt "safe living with his stepfather." J.A. said "he last saw his mother about five months ago," and it " 'didn't end well,' " because " '[s]he was just yelling at [him],' . . . but he knows that he did not do anything wrong." J.A. denied that J.M. was abused or neglected, stating that J.M. "has not made any statements of anyone touching her on her private parts." J.A. also told the Department that he heard Jacqueline "say that [J.M.] has been abused" and that Jacqueline told Juan "that she will call the police and say that [Juan] abused them." J.A. also reported that "in the past, mother has gotten upset and pushed his stepfather," but Juan did not hit or push Jacqueline and " 'just walked away from her.' "

The Department spoke with Jacqueline on June 5, 2024, while she was hospitalized at the psychiatric unit of St. Francis

5

Medical Center. Jacqueline reported she had not had contact with her children since December 2023 and stated "she knows that she needs to 'get myself together' but she still wants to be able to see her children sometimes." Jacqueline "mentioned that she has 'a lot of medical problems' and that she wants to get healthy so she can see her children more." Jacqueline asserted, "in December 2023, she was giving the child [J.M.] a bath when [the] child told her that father touched her vagina. . . . [Jacqueline] stated she has never witnessed father touching [J.M.] or [J.A.] in an inappropriate way. . . . [Jacqueline] stated that she told a detective and a social worker, but she did not get a copy of the report . . . [and] she did not file a police report of what [J.M.] told her." Jacqueline also stated she was " 'kidnapped' and 'held hostage' " by her boyfriend and "was sexually assaulted when she was taken hostage."

The Department noted "[i]t was difficult . . . to engage with [Jacqueline] as she expressed disorganized thoughts," and it ended the interview after Jacqueline started crying and "did not appear to be in a condition to continue." According to hospital staff, Jacqueline was "diagnosed with schizoaffective disorder bi-polar type and she also suffers from night terrors." Staff reported Jacqueline was hospitalized, subject to a "14-day hold that could be extended," she was taking "psychotropic medications," and she would next be "transferred to an in-patient facility."

The Department interviewed the maternal great-aunt (Marie B.) and the maternal grandmother (Gladys A.). Marie had "recently reconnected with mother at the end of 2023 and found out that she has some severe mental health issues. [Marie] reported mother is homeless and she has been in at least ten different mental health facilities since the beginning of the year.

6

[Marie] further reported mother told her that she has abused drugs." Marie stated that "mother told her that she thinks the child [J.M.] is being abused by the father. . . . [M]other also told her that she should have reported her suspicions of [J.M.] being abused but she was dealing with a lot and did not think that people would believe her. [Marie] stated she does not know whether to believe mother or not. [Marie] reported mother has bi-polar, hallucinates and sometimes says things that are not true."

Maternal grandmother Gladys reported Jacqueline "began to exhibit [a] mental health crisis about 1 year ago," describing the crisis as " 'manic episodes.' " Gladys described that "due to her behavior and mental health," Jacqueline "left the home and began to live from place to place ending in a homeless situation. In the last year, [Jacqueline] started to neglect her children and was no longer able to care for them." Gladys believed Jacqueline's "mental health prevents her from being a mother to her children." Gladys stated "she and her husband have made many efforts to help [Jacqueline], but she refuses to take her medication," and "when [Jacqueline] is off her medication, she is aggressive and violent" with Gladys and the maternal grandfather (Luis A.). Gladys "hop[ed]" Jacqueline's "current hospitalization stabilizes her mental health."

Gladys had "consistent contact" and "a close relationship with the children," and she stated "the children have never reported any concern about [Juan]" including any "sexual abuse, physical abuse or neglect." Gladys also had not heard any allegation from Jacqueline or any other person that the children were being abused, and she asserted, "if she observed or suspected concerns, she would file a report to protect" the

7

children.  Gladys had no concerns about Juan's parenting and stated he was "doing a good job raising the children."

The Department interviewed the family again on June 20, 2024.  J.M. stated she missed her mother and had not seen or spoken to her, and she described that her parents used to " 'argue' " and Jacqueline would " 'hit' " Juan.  J.A. reported he now saw Jacqueline "a few times a week," and that she " 'wasn't okay' and that 'things are better' without her being in the home."  J.A. stated Jacqueline would " 'argue' . . . due to [her] mental health," she "would 'yell for no reason,' " and she would " 'smoke weed' " in front of him, but not in front of J.M.  J.A. said "he got so used to [Jacqueline's yelling] that it did not bother him or make him feel afraid," and he "denied physical altercations between [his parents]."

Juan similarly reported that the children were doing " 'a lot better now' " since Jacqueline left the home, because her "bipolar disorder and her episodes . . . [were] affecting the children's grades and attendance."  Juan stated Jacqueline was now living with the maternal grandparents, and he allowed J.A. to see Jacqueline at the grandparents' home because he was "older and is able to communicate better," but J.M. had not seen Jacqueline during that time.  Juan described that Jacqueline "has had 'many 51/50 [psychiatric] holds' since November 2023, has a diagnosis of Bipolar and possibly a personality disorder, and that she has not taken steps to take control of her mental health."  Juan confirmed there were "verbal altercation[s]" between him and Jacqueline, but nothing "physical."  During these arguments, "he would try to keep [] away from [Jacqueline], but due to her declining mental health and her episodes becoming more frequent, he would try to walk away from her to let her cool

8

down. . . . [T]here were a few times when [Jacqueline] would block the door so that he could not leave," and Jacqueline "got to the point where she was 'easily triggered' and anything could cause her to 'have an episode.'"

Juan asserted that Jacqueline "would smoke weed from a vape pen and drink alcohol," although "due to the meds she was on and her diagnosis, she was not supposed to use either, especially not combined." Juan "explained that [Jacqueline] claimed to use the weed to help with anxiety, but he felt it made her symptoms worse." Juan stated Jacqueline "had a 'problem' with the alcohol and when he talked to her about it, she stopped for about a year and then started drinking again. He explained that she would drink to get drunk and received a DUI in 2020 because of her level of drinking." Juan reiterated that Jacqueline "told him she recently used Meth while she was homeless."

Juan described that in November 2023, Jacqueline "had a manic episode at home." According to Juan, Jacqueline "did not sleep well" the night before. Juan was away from the house when he called Jacqueline and noticed that "she sounded 'off,'" because "when she is having or in the middle of an episode, her pattern of speech changes." Juan asked maternal grandfather Luis to check on Jacqueline, and "[a] short time later, . . . [Juan] received a call and heard screaming and commotion, which prompted him to race home." When Juan entered the house, "he found [Jacqueline] on the ground thrashing around and being held by [Luis]. [Juan] stated that it sounded like [Jacqueline] was 'possessed' because she was not making any sense. [Juan] stated that they contacted law enforcement and that, once police arrived and entered the home, [Jacqueline's] demeanor changed and she began to ask the officers for 'help.'"

9

Juan stated "he was planning to file the divorce and custody papers soon" and request "Guardianship for [J.A.]," but the Department social worker advised that "to her understanding, Family Law will not touch a case if the family is involved in a Dependency court case."

The Department contacted Jacqueline and scheduled an on-demand drug test for June 25, 2024. Jacqueline informed the Department "that she may test positive for Marijuana, as she uses marijuana gummies to help with her anxiety and depression." "A short time later," Jacqueline called the Department and "explained that she was at a party Friday night, 06/21/2024, and 'did cocaine.' [Jacqueline] stated that she does not 'usually' do drugs like that and that she is 'going through a lot' without the children."

The Department reinterviewed Jacqueline on June 26 at the maternal grandparents' home. Jacqueline stated "she is not currently employed, as she recently 'got back' from being on a psychiatric hold and is working towards improving her mental health." Jacqueline reported she was attending outpatient mental health treatment "1-2 days a week," where she was "mostly participating in group-sessions for Anger Management" and "self-care." She had an upcoming psychiatric appointment "to determine if her medication is appropriate or if any changes need to be made, along with getting her set[ ]up with individual therapy." "Regarding [her] mental health diagnosis," Jacqueline "stated that she has not been given an official diagnosis for what she has been experiencing, but 'possibly Bipolar Disorder.'" Jacqueline also stated she was "diagnosed with ADHD, Major Depressive Disorder, Anxiety, OCD, and PTSD." Jacqueline described "she was prescribed Cymbalta for anxiety, which she

10

'almost had a stroke' from and caused her to be hospitalized due to the negative side effects. . . . [She] described herself as 'not the same' since taking this medication and having this experience." The Department received materials from Jacqueline's caseworker from a mental health outpatient program, confirming that Jacqueline was currently attending treatment " '2-3 times a week, and has not missed an appointment,' " and she was " 'cooperative and engaged in [caseworker] conversations and during the group.' "

"Regarding drug and alcohol use/abuse, [Jacqueline] stated that she first tried drugs when she was 16 years old. She stated that she smoked meth that was laced with fentanyl, which caused her to overdose. She further stated that she recently was 'forced' to do crystal meth while being 'held captive' . . . [S]he was being blamed for calling the police and was forced to smoke the crystal meth by being threatened to be killed by her captor. . . . [O]ther than those incidents, she typically would just do 'THC' marijuana gummies, which she felt helped with her depression and anxiety. As for alcohol, [Jacqueline] stated that she currently does not drink, but would drink 'sometimes' when she was still living with [Juan] . . . [and] would occasionally 'pass out' from her drinking." Jacqueline "stated that she got a DUI a few years ago and was sober 'for some time,' but when she became homeless, she would drink to numb herself."

About her recent cocaine use, Jacqueline described "she bought cocaine from someone that lives in the area," and she was "alon[e] when she 'snorted it.' " Although she previously told the Department she did cocaine "at a party," Jacqueline "stated that she was not at a party, but was outside [her] home." Jacqueline "did 'two lines,' " "felt 'euphoric' and 'active,' " and " 'didn't like

11

it.' " "She expressed 'regret' for what she did and explained that she has been 'struggling' since she was kicked out of the home by [Juan]. Between going from being with the children '24/7' to only seeing [J.A.] a few times and not seeing or speaking with [J.M.] since she left, along with her trauma from being homeless and her hospitalizations, [Jacqueline] stated she needed an outlet."

Jacqueline recounted that J.M. told her Juan " 'touched her down there' . . . when [Juan] was cleaning her when she had used the bathroom." Due to "marital issues" with Juan, and because of J.M.'s statement, Jacqueline " 'blew up' " on Juan, started a "verbal fight," and had a " 'breakdown,' " causing the maternal grandparents to call the paramedics. Jacqueline recalled that J.A. was "present and witnessed what happened," but she was not sure if J.M. saw the incident. Jacqueline was hospitalized, then stayed for a time with great-aunt Marie, but developed "issues" because Marie "tri[ed] to 'control' her." Jacqueline then stayed at her parents' home, but she left after a "fight" over "putting [her] under conservatorship." Jacqueline stated "she met a person on the streets who offered to let her [] spend the night in his tent." Jacqueline stayed with this man "longer than she intended" and "during the last month of being there," she was "threatened by him and others," who " 'beat' her up and threatened to kill her." Jacqueline stated she was "held 'captive,' [and] she was 'forced' to use meth." Jacqueline stated this man also threatened her parents. She was able to " 'escap[e]' " and she "was found by paramedics, who transported her to the nearest hospital." Jacqueline "told them the story from the beginning, which included [J.M.]'s disclosure. [Jacqueline] stated she did not intend it to cause [the Department's] involvement and that she does not feel the children are in any danger while in the care

12

of [Juan]. She stated that she feels the children are 'well taken care of with him.' "

Maternal grandmother Gladys stated that before Jacqueline's "episode in 2022[,] [she] was a very good mother. . . . After 2022, [Gladys] stated that [Jacqueline] became more isolated, possibly from depression, and was not mentally there." Gladys "was concerned that due to [Jacqueline]'s mental health that [she] could have neglected the children." If Jacqueline "were to have the children alone in this moment," Gladys did "not feel that [Jacqueline] would be capable of harming the children; however, she feels that [Jacqueline] is still in the process of stabilizing her mental health and feels that she needs to do that prior to seeing the children alone." Gladys "stated that she feels [Jacqueline] has really improved and is working hard to get herself and her mental health on track. . . . [Jacqueline] misses the children and has been struggling without them, but is working hard to be better for them."

Maternal grandfather Luis concurred that, as a parent, Jacqueline was "very sweet and has good intentions. However, he feels her mental health has affected her. He stated that she was prescribed medication and either was not taking [it], or was taking medications that gave her adverse side effects[,] . . . [which] caused her to become easily frustrated with the children and verbally aggressive." Luis described that Jacqueline "would say negative things about [Juan] and claim that he would treat her badly, but then when her mental health stabilized, would deny what she said or would change the story." Luis believed Jacqueline's "mental health is more stable and has improved, as he feels she is more centered and determined to get better."

13

The Department also contacted an officer from the Los Angeles Police Department, Officer Knolls, who responded to Juan and Jacqueline's home for a " 'female mental illness call' " in 2023. Officer Knolls "explained that mother appeared to be in the 'beginning stages' of her mental health. He also stated that, although she was not a threat to herself or others, 'She was off' " and had " 'turned the house inside out' " and " 'flipped everything over.' " Officer Knolls "attempted to have the MEU (Mental Evaluation Unit) come to the home to place mother on a hold," but was "able to convince mother to leave the home and stay with maternal grandparents," where she "placed herself on a voluntary psychiatric hold."

Officer Knolls later responded to Jacqueline's report of suspected child abuse in June 2024, about "8-12 months" after the mental illness call. Arriving at the family home, Officer Knolls observed "that the children appeared to be fine and that mother was not in the home," and Juan reported Jacqueline was "living 'in a truck or van' and that [Juan] would drop off food and clothing 'to keep her away.' " Officer Knolls stated "he did not have any concerns for the children while in the care of [Juan], as long as mother stays away. He described it as being 'quiet' since mother left the home."

The juvenile court held a detention hearing on July 18, 2024, and detained J.A. and J.M. from Jacqueline with an order of monitored visitation for Jacqueline. The court found Rene was J.A.'s presumed father and Juan was J.M.'s presumed father, and it released the children to their respective fathers. Rene agreed to let J.A. remain in Juan's care.

14

B.    *Jurisdiction and Disposition Proceedings*

The Department prepared a jurisdiction and disposition report in August 2024.

As to the allegations of neglect due to mental illness, Jacqueline told the Department she did not agree that "schizoaffective disorder" was "an accurate diagnosis. My current diagnosis is bipolar disorder type 2. [This] [d]iagnosis was given to me as a result of my time with [current mental health provider]. The Schizo [a]ffective disorder diagnosis comes from my most recent psych hospitalization. All the other diagnos[es] I believe are correct." Jacqueline also commented:

> "Since all of this has happened, I am actually doing really well and I am very happy with taking care of myself. I believe the therapy and the medication that I'm currently taking are all working very well. There w[ere] never any hallucinations as it was described previously. I would say the biggest impact on me was I was very short and frustrated and became at times aggressive. None of this was around my children as I was already out of the house at this time. My children have never seen [my] mental state. I do agree that I was not taking [my] medication and it was affecting my ability to care for my children. When I am good with my mental health, I don't have any negative side effects and it never would affect my ability to care for the children. I am currently taking Lamotrigine a mood stabilizer, gabapentin, Strattera and Wellbutrin all to deal with anxiety and

15

depression.  I am also currently enrolled in therapy and seeing a psychiatrist[.]  I am currently enrolled in [Narcotics Anonymous] meetings and I have a sponsor."

J.M. told the Department she missed her mother, " 'but she was very mad and yelled a lot.  I am not afraid of her and like to play with her.' "  J.A. reported, " 'I like to spend time with my mom now when she is healthy . . . I feel like my mom is so much happier now.  I can tell spending time at the hospital and getting on her medication, she is doing much better.  Before she was very upset and would get mad very easily.  I feel like she is doing so much better now and I'm very proud of her.  I like being with her and just want her to be ok.' "

Juan stated, " 'I'm not sure about all these diagnoses that are listed [in the dependency petition].  I thought it was just bipolar.  As I stated earlier when Jacqueline's mental health is on point, she is a great mother and I would never have any concerns for her about her ability to care for [the] children.  However, when her mental health is not correct, there are some significant concerns which are well documented.  As I said earlier, I believe she is doing much better and is getting the help that she needs through therapy, taking her medication and any of the other programs that she is currently involved in.  There is so much difference when she is in a good place mentally.' "  Grandparents Gladys and Luis reported they felt " 'really positive because [Jacqueline] is going to her classes and taking her medications.  [We are] very happy with her . . . [while] monitoring the visits [with the children].  [We] love seeing the children as they interact

16

with mom and see that she is healthier.  She loves these children and would do anything.' "

As to the substance use allegations, Jacqueline stated:  " 'I don't agree with [the dependency petition] where it says [c]urrent user.  I am going to [Narcotics Anonymous][,] I am not abusing meth.  I never did that in front of my children.  I used cocaine when I was living on the streets and[/]or at my mom's house, but it was never in front of my children.  The only drugs that I ever used when I was at home was marijuana.  I got into meth as well as cocaine when I was living on the street.  I did it out of the environment that I was living in.  I am not currently using any medication or drugs in a negative way.  Even back in 2021 when I had my DUI[,] I was not around my children.  The children were with their grandparents during that time.  I don't feel like there was any negative impact on my children.' "

Juan believed the drug use allegations were " 'all from [Jacqueline's] past.  She is not currently using, and I don't think it's fair that we hold her accountable to things that have happened in the past.  I believe this all happen[ed] when she was last on her hospital hold.  She was never around me and I never would've been OK with it.  Part of that reason is why I kicked her out of the house and why we are no longer together.' "  The maternal grandparents stated they were " 'tak[ing] [Jacqueline] to the [Narcotics Anonymous] meeting[s]' " and didn't " 'have any concerns for he[r] using the drugs or alcohol . . . the way [they] did before.  If [we] did [we] wouldn't allow her in [our] home and also wouldn't allow the kids to be around her if she was drinking or using drugs.' "  Jacqueline's Narcotics Anonymous sponsor Rhonda, stated:  "I feel that mother is making great progress in attending meetings and is very determined in meetings.  She has

been sober since 6/21/24 [and] committed to staying this way for herself and her children.  She attends her meetings and I don't have any concerns for her right now."  J.M. did not know "what drugs were," and J.A. stated he " 'never saw my mom use drugs or drink.' "

The Department's jurisdiction and disposition report observed, "During the course of this assessment, the Department has been able to observe the family's resilience and found that both father[s] . . . [are] extremely resilient in that despite mother's instability with her mental health the children have been well cared for and loved.  Both father[s] are gainfully employed and are providing for the basic necessities of the children's lives. . . .  Regarding mother Jacqueline A[.], she appears to be bouncing back from the most recent manic episode and has accepted that her mental health is going to be an ongoing work [sic] moving forward and is already enrolled and connected to psychiatric, therapy and mental health case management."  The Department concluded, "[t]he children have been observed interacting with both mother and father and appear to be comfortable interacting with both and provided statements that they have never felt unsafe in mother and father's care."  Visitation, monitored by maternal grandmother Gladys, was reportedly "going great.  Children report that visits are going well and they enjoy spending the time with mother and that she is so much happier now that she is healthy."

When asked about his family's needs, Juan stated, " 'I want to know that Jacqueline continues with her mental health stuff as I can see the huge difference in her.  When she is in a good place mentally, she is such a loving and caring mother.  She just needs to stay on her therapy, and medications.' "  Rene expressed

his need to " 'be there with my son [J.A.]' " and he agreed that " 'Jacqueline needs to be able to manage her mental health and stay clean and sober.' " J.A. and J.M. both "miss[ed]" Jacqueline and J.A. asserted his desire for Jacqueline "to just be healthy and happy . . . [I] want to be with her again when she is healthy."

The juvenile court held a combined jurisdiction and disposition hearing on August 30, 2024. Over Jacqueline's objection, the court sustained the dependency allegations as pled and found J.A. and J.M. were children described by section 300, subdivision (b).

As to disposition, the court declared J.A. and J.M. dependents of the court and removed the children from Jacqueline. The court awarded sole physical custody of J.A. to Rene and J.M. to Juan, but it noted Rene could "continue" his "arrangement" with Juan for care of J.A. The court also gave Jacqueline joint legal custody with Rene and Juan, advising "fathers, you are to consult with mother on any serious education, healthcare, or any decisions including your children, but if mother is not responsive, you have tie-breaking authority." The court further ordered Jacqueline was "not to reside" in the family home with Juan but would receive monitored visitation. The court then terminated dependency jurisdiction.

Jacqueline timely appealed.

## DISCUSSION

A. *Governing Law and Standard of Review*

Section 300 provides that a child "is within the jurisdiction of the juvenile court" and may be "adjudge[d] . . . to be a dependent child of the court" if "[t]he child has suffered, or there

19

is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . [t]he inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness . . . or substance abuse." (§ 300, subd. (b)(1)(D).) The statute "require[s] [the Department] to demonstrate three elements": "(1) . . . inability to provide regular care for the child due to mental illness . . . or substance abuse[]; (2) causation; and (3) 'serious physical harm or illness' to the minor, or a 'substantial risk' of such harm or illness." (*In re Joaquin C.* (2017) 15 Cal.App.5th 537, 561 (*Joaquin C.*).) The Department "bears the burden of proving that the minor comes under the juvenile court's jurisdiction by a preponderance of the evidence." (*In re Israel T.* (2018) 30 Cal.App.5th 47, 51; accord, *In re M.R.* (2017) 7 Cal.App.5th 886, 896.)

"Section 300 requires proof a child is subject to the defined risk of harm at the time of the jurisdiction hearing. [Citations.] But the 'court "need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child." [Citation.] And a parent's " ' "[p]ast conduct may be probative of current conditions" if there is reason to believe that the conduct will continue.' " [Citation.] However, " '[t]o establish a defined risk of harm at the time of the hearing, there "must be some reason beyond mere speculation to believe the alleged conduct will recur." ' " ' " (*In re Gilberto G.* (2024) 105 Cal.App.5th 52, 62; accord, *In re S.F.* (2023) 91 Cal.App.5th 696, 712-713.)

" ' " 'We review the juvenile court's jurisdictional findings for sufficiency of the evidence. [Citations.] We review the record to determine whether there is any substantial evidence to support the juvenile court's conclusions, and we resolve all

20

conflicts and make all reasonable inferences from the evidence to uphold the court's orders, if possible.  [Citation.]  "However, substantial evidence is not synonymous with any evidence.  [Citations.]  A decision supported by a mere scintilla of evidence need not be affirmed on appeal.  [Citation.]  Furthermore, '[w]hile substantial evidence may consist of inferences, such inferences must be "a product of logic and reason" and "must rest on the evidence" [citation]; *inferences that are the result of mere speculation or conjecture cannot support a finding* [citations].'  [Citation.]  'The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record.' " ' " ' " (*In re B.D.* (2024) 103 Cal.App.5th 315, 323-324 (*B.D.*); accord, *In re J.A.* (2020) 47 Cal.App.5th 1036, 1046.)  " 'We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.'  [Citation.]  [The appealing parent] bears the burden on appeal to show that the evidence was not sufficient to support the finding." (*In re M.C.* (2023) 88 Cal.App.5th 137, 151.)

"As a general rule, a single jurisdictional finding supported by substantial evidence is sufficient to support jurisdiction." (*In re M.W.* (2015) 238 Cal.App.4th 1444, 1452.)  Thus, "[w]hen a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence.  In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence." (*In re*

21

*Alexis E.* (2009) 171 Cal.App.4th 438, 451 (*In re Alexis E.*); accord, *In re Jonathan B.* (1992) 5 Cal.App.4th 873, 875-876.)

B.      *Substantial Evidence Supports Dependency Jurisdiction Under Section 300, Subdivision (b)(1)*

Jacqueline argues there was no substantial evidence of a substantial risk to J.M. and J.A. of serious physical harm or illness, as required for dependency jurisdiction under section 300, subdivision (b)(1).  In Jacqueline's view, "even assuming there was a nexus between [her] mental illness" or substance abuse "and an inability to provide regular care for the children," the Department failed to prove a substantial risk of harm to the children because "Juan was able to protect the minors from any harm," he "was providing the daily care for both children, and was keeping the children safe from mother."  We affirm the juvenile court's jurisdiction and disposition orders on the ground that Jacqueline's mental illness posed a substantial risk of physical harm to the children.

Here, the juvenile court found that Jacqueline's mental illness caused a substantial risk of harm to the children.  For purposes of dependency jurisdiction, " '[h]arm to the child cannot be presumed from the mere fact of mental illness of the parent.' " (*In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1652 (*In re Kristin H.*); accord, *Joaquin C.*, *supra*, 15 Cal.App.5th at p. 563.) Instead, "[t]here must be some connection between the parent's mental health issues and the physical harm or risk of physical harm to the child."  (*In re B.H.* (2024) 103 Cal.App.5th 469, 485; accord, *In re A.L.* (2017) 18 Cal.App.5th 1044, 1049-1050 (*A.L.*).)

Jacqueline argues there was no risk of harm to her children, citing *A.L.*, *supra*, 18 Cal.App.5th 1044 and *In re A.G.*

22

(2013) 220 Cal.App.4th 675 (*A.G.*). In *A.L.*, a mother with schizophrenia suffered a manic episode in the family home and "became very upset, accusing [her family of] trying to poison her" and "started throwing objects, including a shoe that hit [her daughter] on her arm or head." (*A.L.*, at p. 1046.) Mother's teenage son "physically restrained Mother while the father called law enforcement for assistance." (*Ibid.*) Mother was placed on an involuntary psychiatric hold and hospitalized; she had previously been hospitalized for mental health and prescribed medication, but had "refus[ed]" to take her medication regularly in the previous year. (*Ibid.*) The juvenile court sustained jurisdictional allegations under section 300, subdivision (b)(1), based on mother's "mental and emotional problems," which the court found placed the children at substantial risk of serious physical harm. (*Id.* at pp. 1048-1049.) The Court of Appeal reversed for lack of substantial evidence, noting "[a]lthough Mother had been diagnosed with schizophrenia for some time, this was the first time the family sought assistance from law enforcement," "[n]o one was injured and the father acted quickly to obtain appropriate help," "the evidence showed that [the children] were well cared for in spite of the reality that Mother suffered from mental illness," and "the family worked together to manage the situation and their efforts were successful." (*Id.* at p. 1051.) Because there was no "reason to believe that the father and the family will be unable to safely handle any future problems . . . the juvenile court erred in asserting jurisdiction." (*Ibid.*)

In *A.G.*, the Court of Appeal also concluded the juvenile court "erred in sustaining a petition that alleged only that Mother is mentally ill and is unable to care for the minors where Father has always been, and is, capable of properly caring for

23

them." (*A.G.*, *supra*, 220 Cal.App.4th at p. 683.)  In that case, the mother had lived with schizoaffective disorder for "seven or eight years" before the dependency proceedings, and her mental illness remained untreated at the time of the juvenile court's jurisdiction hearing:  Mother "refused to take her medication . . . [,] denying that she had a mental illness," she "was not 'able to develop a loving maternal bond with' the minors," and she had " 'recently bec[ome] very psychotic with poor insight and judgment.' " (*Id.* at pp. 683-684.)  "Although the evidence supported the finding that Mother was unable to provide regular care for the minors due to her mental illness, Father ha[d] shown remarkable dedication to the minors and that he is able to protect them from any harm from Mother's mental illness.  Father ensured that there was adult supervision, other than Mother, of the minors at all times . . . and temporarily moved out of the house with the minors to protect them from Mother." (*Id.* at p. 684.)

In contrast to *A.G.* and *A.L.*, there was significant evidence of a "substantial risk" to J.M. or J.A. of "serious physical harm or illness" because of Jacqueline's mental illness.  (§ 300, subd. (b)(1).)  The evidence here indicated that for some time before the November 2023 incident, Jacqueline was experiencing more significant mental health problems with increased frequency, which the family described as " 'manic episodes.' "  Jacqueline "refuse[d] to take her medication" during her escalating mental health crisis and instead used marijuana and alcohol, which Juan observed "made her symptoms worse."  Jacqueline agreed that at this time, " 'I was not taking [my] medication and it was affecting my ability to care for my children.' "  Juan reported that in "past incidents," Jacqueline "push[ed] him during a mental health 'episode,' " causing him to "walk away or call the police."  J.M.

24

described that her parents used to " 'argue' " and Jacqueline would " 'hit' " Juan. J.A. similarly reported that "in the past, mother has gotten upset and pushed his stepfather," but Juan did not hit or push Jacqueline and " 'just walked away from her.' " Juan, J.A., and J.M. also described that Jacqueline would start "verbal altercation[s]" and " 'yell for no reason.' " Grandmother Gladys similarly stated Jacqueline was "aggressive and violent" with her and grandfather Luis.

The juvenile court could reasonably conclude from these accounts that if Jacqueline had a manic episode while with the children, there was a substantial risk she would cause physical harm to the children. Unlike *A.G.* and *A.L.*, there was evidence here that Juan had previously called the police on Jacqueline to control her mental health episodes. This was evidence that the family did not know how to manage Jacqueline's mental health crises, in contrast to the families in *A.L.* and *A.G.* Whereas the children in *A.L.* "were not youngsters" and "knew what to do when Mother was in a manic state," J.M. was six years old or younger at the time of Jacqueline's escalating mental health crisis. (*A.L.*, *supra*, 18 Cal.App.5th at p. 1051.) Jacqueline argues that there was no substantial evidence of a future risk of physical harm to the children because Juan barred her from the family home to protect the children after the November 2023 police visit. But the juvenile court could reasonably infer from this evidence that Juan did not know how to handle or mitigate Jacqueline's mental health episodes while she was living with the children, and thus, there was a substantial risk of physical harm to the children if Jacqueline were permitted in the family home again or had unmonitored visitation.

25

While Jacqueline relies on *A.G.* and *A.L.*, those cases also did not involve a parent's mental illness compounded by substance abuse. Here, there was evidence that Jacqueline used marijuana and alcohol in the home, including in front of J.A. Jacqueline admitted "she would occasionally 'pass out' from her drinking" while living with Juan and that she was convicted of a DUI within the past few years. Juan stated Jacqueline "was not supposed to use either [alcohol or marijuana], especially not combined," "due to the meds she was on and her diagnosis," and he believed that this substance use made Jacqueline's mental health symptoms worse. It was undisputed that after Jacqueline left the family home, she experienced a severe, months-long episode of mental illness wherein she became homeless; used alcohol, methamphetamine, and cocaine to cope; and passed in and out of psychiatric hospitalization, which led to a new diagnosis of schizoaffective bipolar disorder. Although Jacqueline had been participating in mental health and substance use treatment for approximately two months at the time of the jurisdiction hearing, her participation was new, and the juvenile court could reasonably infer that her stability was tentative given her years-long history of escalating mental health crises, along with her escalating substance use.

Taken together, these circumstances are substantial evidence that Jacqueline's mental health posed a substantial risk of physical harm to the children if she returned to the family home or had unmonitored visitation. (See *In re Kristin H.*, *supra*, 46 Cal.App.4th at p. 1654 [affirming finding of substantial risk of physical harm because of mother's mental illness and substance abuse where evidence showed "that the mother was in crisis and that [child] should not be in her care," "the mother's drug abuse

26

exacerbated her condition and impaired her already poor judgment and her ability to function as a mother," mother "would not regularly take medications which could have been helpful in stabilizing her mood swings," and "[i]n times of stress, she resorted to drugs"].)

Because substantial evidence supported at least one jurisdictional finding, we need not address the juvenile court's additional jurisdictional finding that Jacqueline's substance abuse also posed a substantial risk of physical harm to the children. (See *In re Alexis E.*, *supra*, 171 Cal.App.4th at p. 451.)

C.  *Remand is Appropriate To Conform the Juvenile Court's Written Custody Exit Order to Its Oral Ruling*

Jacqueline requests, and the Department does not oppose, clarification of the court's custody exit order, because the oral and written rulings are in conflict. The parties agree that the court's oral custody ruling controls over its written exit orders.

Here, the court's oral ruling provided for joint legal custody and ordered "fathers . . . to consult with mother on any serious education, healthcare, or any decisions including your children, but if mother is not responsive, you have tie-breaking authority." But the written custody orders, while providing for joint legal custody, stated more generally that Rene had "tie breaking decision making authority over [J.A.] where parents do not agree on an issue" and, regarding J.M., that Juan had "tie breaking authority regarding legal custody issues." The written custody orders also did not expressly order Juan and Rene to consult with Jacqueline on "decisions including your children."

"The Courts of Appeal have reached differing conclusions regarding which order controls when a juvenile court's oral

27

pronouncements differ from its written order." (*In re Karla C.* (2010) 186 Cal.App.4th 1236, 1259, fn. 9.) But here, where the parties agree that the oral custody ruling controls over the written custody orders, we remand and direct the juvenile court to conform the written custody orders to its oral ruling. (See *In re A.C.* (2011) 197 Cal.App.4th 796, 800 ["direct[ing] the juvenile court to correct the exit order so it is consistent with the oral order regarding visitation"]; *In re Maribel T.* (2002) 96 Cal.App.4th 82, 86 [where "written custody order fail[s] to conform to the juvenile court's oral order," the appropriate remedy is to "modify the custody order to conform to the juvenile court's oral ruling and affirm"].)

## DISPOSITION

The judgment is affirmed. The matter is remanded to the juvenile court to correct the final custody orders to conform to its oral ruling, i.e., to indicate that "fathers . . . are to consult with mother on any serious education, healthcare, or any decisions including your children, but if mother is not responsive, you have tie-breaking authority."

MARTINEZ, P. J.

We concur:


FEUER, J.                                STONE, J.


28